**PUBLICKER INDUSTRIES, INC.**

v.

**David COHEN.**

**Appeal of PHILADELPHIA NEWSPAPERS, INC. in Nos. 83–1022 and 83–1041.**

**PUBLICKER INDUSTRIES, INC.**

v.

**David COHEN.**

**Appeal of DOW JONES & COMPANY, INC. in Nos. 83–1023 and 83–1055.**

**Nos. 83–1022, 83–1023, 83–1041 and 83–1055.**

United States Court of Appeals, Third Circuit.

Argued Sept. 12, 1983.

Decided April 30, 1984.

As Amended May 29, 1984.

Steven B. Feirson (argued), Amy B. Ginensky, Dechert, Price & Rhoads, Philadelphia, Pa., for appellant Philadelphia Newspapers, Inc.

Edward M. Posner (argued), Cynthia J. Giles, Drinker, Biddle & Reath, Philadelphia, Pa., Robert D. Sack, Ann R. Loeb, Patterson, Belknap, Webb & Tyler, New York City, for appellant Dow Jones & Company, Inc.

H. Robert Fiebach (argued), Jeffrey S. Saltz, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellee Publicker Industries, Inc.

Before WEIS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, JR., Circuit Judge.

Appellants, Philadelphia Newspapers, Inc. and Dow Jones & Company, Inc., appeal from three decisions of the district court, the first of which closed a hearing on motions for preliminary injunctions to the public and the press. One of these motions asked the district court to order Publicker Industries, Inc., appellee, to disclose certain information at its annual stockholder's meeting concerning Publicker's operations which it sought to keep confidential. The district court's second decision ordered the transcript of the hearing that related to this "confidential" information to be sealed. The third decision ordered appellants' counsel not to disclose to their clients this "confidential" information even though Publicker's memorandum of law opposing appellants' motions for access to the judicial transcripts revealed it.

Appellants claim that the district court abused its discretion in each of these three decisions and thereby violated their common law and First Amendment rights of access to the civil trial and judicial records. Appellants also claim that the district court violated their rights to due process as well.

These appeals bring to this court an issue of first impression: Does the First Amendment secure to the public and to the press a right of access to civil proceedings? We hold that the First Amendment does secure a right of access to civil proceedings. Because the district court committed certain procedural and substantive errors with respect to its three decisions that impermissibly violated appellants' First Amendment, common law and due process rights, we will reverse the decisions of the district court.

## FACTS

The weighty constitutional questions presented in these appeals arise from a seemingly unrelated proxy fight to determine control of a publicly traded corporation. The corporation, Publicker Industries, Inc. ("Publicker"), has outstanding

over 8,300,000 shares of stock which are traded on the New York Stock Exchange by some 6,000 stockholders. The Neuman family, however, controls approximately 37% of these shares through individuals and through various estates.

The defendant in the underlying litigation, David Cohen, sought to gain control of Publicker's Board of Directors at its annual stockholders' meeting scheduled for December 8, 1982. Two months earlier Cohen had entered into an agreement with certain members of the Neuman family granting him their irrevocable proxies to be voted at the December meeting. In return, Cohen agreed to purchase a substantial number of Neuman family shares of Publicker stock if he succeeded in gaining control of the board.

This agreement was resisted by a member of the Neuman family who brought an action in the Orphans' Court Division of the Court of Common Pleas of Delaware County, Pennsylvania. The complaint alleged that the agreement violated Pennsylvania Corporate Law, 15 Pa.Cons.Stat.Ann. § 1504 (Purdon 1983), which prohibits any corporate stockholder from selling his voting rights or his proxy. Following a hearing, Orphans Court Judge Francis J. Catania set aside the stock purchase agreement because it was without legal foundation.

By this time, Publicker already had commenced the suit from which these appeals arise. On the day of the Delaware County Orphans Court hearing, December 2, 1982, Publicker filed a complaint against Cohen in the United States District Court for the Eastern District of Pennsylvania claiming that Cohen had made misrepresentations and had failed to make material disclosures in Schedules 13D and 14B that he filed with the Securities and Exchange Commission in connection with his planned purchase of Publicker stock. Publicker also filed a Motion for Preliminary Injunction asking the court to enjoin Cohen from soliciting proxies for and voting proxies at the annual meeting on December 8.

Informed of Judge Catania's order of December 2, 1982 setting aside the stock purchase agreement, Publicker filed a Motion for Temporary Restraining Order ("TRO") on December 3, 1982. Publicker maintained that Judge Catania's order required Cohen to amend his SEC filings to show that this agreement had been invalidated. The motion asked the district court to prohibit Cohen from soliciting proxies for the December 8 meeting until he amended his filings. The district court held a conference on December 3 to consider the TRO on the day it was filed. It was at this conference that the question was first raised concerning the harmful effects to Publicker if certain information concerning its operations were disclosed at the December 8 meeting.

As a result of this conference, the court granted Publicker's motion for a TRO, but ordered another hearing to be held on December 6. At this second hearing, Cohen filed his own Motion for Preliminary Injunction asking the court to postpone the December 8 stockholders' meeting until Publicker disclosed to its stockholders the information referred to at the December 3 conference. Cohen claimed that Publicker's failure to disclose this information violated federal securities laws. Publicker denied this allegation and asserted that disclosure at this time was premature because the nature of the information was such that it might never become material and subject to required disclosure. Publicker also claimed that Cohen violated a confidentiality agreement between him and Publicker in using this information to seek a postponement of the annual meeting. The district court decided to hear Cohen's and Publicker's motions for preliminary injunction the next day.

This hearing commenced on the morning of December 7 in open court. Two issues were before the district court. First, the court had to decide whether Cohen should be enjoined from soliciting and voting proxies because of his failure to comply with federal and state statutes. Second, the court had to determine whether the information that was the subject of Cohen's motion for preliminary injunction was of

such a nature that Publicker was required to disclose it to its stockholders at its annual meeting the next day.

It is not clear from the record whether anyone from the general public attended the morning session of this December 7 hearing. However, when court reconvened after lunch Dick Cooper, a reporter for the Philadelphia Inquirer, was present in the courtroom. At side bar, Publicker immediately requested that the hearing be closed to all except the parties, their counsel and witnesses because of the sensitive nature of the information that was to be discussed and because the very issue before the court was whether this information should remain confidential. After a short recess to afford counsel an opportunity to find authority for excluding the press from the courtroom, the district court granted Publicker's request to close the hearing. The court explained:

It seems to me by permitting the press here now, that the press would be usurping the very function that is reposed in me; namely, deciding whether this information should be revealed or not. That is the very issue of this case... Here, if it is disclosed the press would be making the decision before I made mine and it would make mine moot, and I believe in protection of my own judicial functions in this case I have the power to exclude the press and I will.

Joint Appendix ("JA") at A117. When the court directed members of the press to leave the courtroom, Cooper objected to the closing of the courtroom and asked the court for an opportunity to be heard through counsel. The court acknowledged Cooper's objection and request and said that it would allow Cooper an opportunity to be heard through counsel.

A short time later the court stopped the proceedings to permit another reporter to enter the courtroom. She identified herself as Virginia Inman, a reporter for the Wall Street Journal. She requested a hearing with counsel present in order to determine why the hearing was closed. The court denied her request.

Some time later attorneys for both Philadelphia Newspapers, Inc. ("PNI") and Dow Jones & Company, Inc. ("Dow Jones"), the publishers of the Inquirer and the Wall Street Journal, appeared to ask that the proceedings be opened. The court again stopped the proceedings to afford the newspapers an opportunity to be heard. Counsel for PNI urged the court to open the hearing or, failing that, to close only those parts of the hearing that involved the confidential information while allowing the rest of the hearing to remain open. The court rejected counsel's request and commented that "[s]o far everything that we have been dealing with has been 'confidential.'" *Id.* at A137. When pressed by counsel to explain its exclusion of the public, the court stated:

I can see an over-riding interest of the Court in closing these proceedings because the information that is confidential, at this moment at least, is information which could possibly have adverse effects, but [the] very issue involved before me is whether or not that information should be revealed and whether or not it should be made public. That's the very issue before me.

If I were to permit the newspapers in here you would be usurping my function in deciding the case before I did by revealing the information, even though I [might] ultimately decide that it shouldn't be revealed.

*Id.* at A134–35. The court later added that "the most intelligible explanation of my conduct is that it is a 'Catch-22.'" *Id.* at A140. The proceeding resumed with the public excluded.

Counsel for the newspapers immediately applied to this court for a Writ of Mandamus to compel the district court to reopen the hearing on the motions for preliminary injunction. This court denied the petition the next day.

By that time, the hearing was completed and the district court had rendered its decision. The court denied Cohen's motions to enjoin the convening of the December 8, 1982 stockholders' meeting on the ground

that he lacked standing because he had retained no interest in Publicker after the Delaware County court invalidated the stock purchase agreement. The district court also held that "the order for confidentiality [remained] in force." *Id.* at A198. It later suggested, however, that it continued the order for confidentiality until it could decide the merits of that issue. It stated,

I have not reached the question of whether this is the type of thing, information that should be disclosed or that a Court can compel disclosure, whether this is something that is a sound good faith business decision of the directors, not to disclose it.

I have not reached those questions.

*Id.* at A200.

PNI filed a motion on December 20, 1982 for immediate access to the transcript of the December 7, 1982 hearing. Dow Jones joined in this motion the next day. Publicker countered with a Motion for Order Respecting Confidentiality to keep confidential portions of its memorandum of law that described the adverse effects that could attend disclosure of the sensitive information. The district court granted this motion in an order of January 6, 1983. Thus, while attorneys for PNI and Dow Jones were informed of the potential harmful effects of disclosure of the confidential information, they were ordered not to disclose this information to their clients.

In its memorandum of law in opposition to PNI's and Dow Jones' motions for immediate access to the hearing transcript, Publicker included a schedule which listed those portions of the transcript in question that were nonconfidential. By Publicker's own admission, over two-thirds of this transcript contains no confidential information. Approximately one-third of the transcript of the afternoon session is deemed by Publicker to be nonconfidential. Curiously, almost one-quarter of the transcript relating to the morning session is now labeled confidential. Yet, Publicker did not request that the court close the morning session.

In its second order of January 6, 1983, the district court directed Publicker to deliver to PNI and Dow Jones those portions of the transcript designated as nonconfidential. The order also denied the newspapers' motions for immediate access to the transcript in all other respects. The court did not issue an opinion to explain its order. Thus, the "sensitive" information and those portions of the December 7, 1982 hearing transcript relating to the "sensitive" information remained under seal with no explanation as to why the information should not be disclosed.

On January 14, 1983, PNI and Dow Jones filed this appeal from the district court's orders of December 7, 1982 and January 6, 1983. They maintain that the district court's closing of the December 7, 1982 hearing to the public and to the press deprived them of their common law and First Amendment rights of access to a civil trial without due process of law. They also claim that the district court's sealing of portions of the transcript of the December 7, 1982 hearing deprived them of their common law and First Amendment rights of access to the transcript of a civil trial without due process of law.

While this appeal was pending, and more than two months after we heard oral argument on appeal, Publicker filed a motion on November 17, 1983 to dismiss this case on grounds of mootness. Publicker supported this motion by informing this court of events that occurred after this appeal was taken that rendered confidentiality unnecessary. Because the confidential material will have been disclosed to Publicker's stockholders by the time this opinion is filed, we may discuss this material here without compromising Publicker's interests in this case.

The information in question concerns the production process of one of Publicker's foreign subsidiaries. This subsidiary produces scotch whiskey in Scotland. The subsidiary introduces an enzyme in its production of the grain alcohol used in its scotch whiskey to accelerate the fermentation process. The chairman of Publicker

Industries, Stephen Harmelin, informed the district court that the use of this enzyme is not a health hazard and is not discernible chemically. To the best of his knowledge, this practice is engaged in by forty to fifty per cent of the scotch industry. Moreover, the English Company Finance Act explicitly defines "scotch" in a way that permits the introduction of this enzyme in its production with the approval of Customs and Excise.

Thus, the subsidiary's mere use of the enzyme is not what presented the problem. The problem arose from the subsidiary's failure to get approval for the introduction of the enzyme from Customs and Excise as required by the English Company Finance Act. According to Mr. Harmelin, the subsidiary's use of the enzyme without the requisite approval raised the danger that the scotch was produced illegally and would have to be withdrawn from the subsidiary's world market with an irreparable financial loss to Publicker in the millions of dollars. Even worse, since most scotch whiskeys are blends of the scotches produced by the many different distilleries, the subsidiary's scotch affected the legal status of virtually the entire scotch industry. With the legality of the subsidiary's scotch in doubt, Publicker sought to keep confidential the subsidiary's unauthorized use of the enzyme in its scotch production until Publicker was able to get clarification from Customs and Excises.

One of the two events which Publicker claims renders this case moot is the approval given by Customs and Excise to Publicker's subsidiary to introduce the enzyme in its production of grain alcohol. With this approval, Publicker claims that disclosure of the confidential information would no longer be premature.

In addition, an action was filed on March 21, 1983 by a Publicker shareholder which involved the same confidential information which is the subject of this suit. *Publicker Industries, Inc., derivatively by Alma Elias v. Clifford B. Cohn, et al.*, No. 83–1357. This case was assigned to the same district judge who decided this case below. This derivative action produced a settlement, subject to the district court's approval after notice to the stockholders and a hearing. The district court accordingly entered an order on November 17, 1983 directing Publicker to send to its stockholders notice of this proposed settlement and setting the hearing for December 28, 1983. The notice to stockholders reveals the confidential information which is the subject of this suit.

Consequently, Publicker has decided to no longer oppose disclosure of the information or access to the transcripts of the below. It now asks us to dismiss this case as moot and remand it to the district court with directions to enter an order unsealing the record. It asks alternatively, in the event that we conclude that this case is not moot, for an order unsealing the district court's records of the proceedings below.

I.

We address first the question of mootness. Publicker argues that it no longer opposes disclosure of the information or public access to the lower court's records. Because it is the only party to this action that requested confidentiality, and because it no longer opposes public access to the information and to the court records, Publicker insists that there is no justiciable case or controversy before this court. Therefore, it contends that this case should be dismissed as moot.

■ In this case the test to determine mootness is whether the underlying dispute is "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). The Supreme Court has established two conditions that must be satisfied to meet this test: " '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.' " *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979) *quoting Weinstein v.*

*Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975)).

 The Supreme Court has recognized that criminal trials are generally of such short duration that closure orders typically " 'will evade review....' " *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 563, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980) *quoting Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 547, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976). This case concerns a hearing to consider whether certain evidence be deemed confidential. Certainly, no one can seriously argue that a proceeding of this nature is not of a shorter duration than criminal trials. Thus, we conclude that orders closing these types of hearings also will evade review. Moreover, we can be reasonably certain of the recurrence of the exclusion of the public and the press from hearings to decide whether potentially injurious business matters should be kept secret. *See, e.g., Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d 1165 (6th Cir.1983); *Joy v. North,* 692 F.2d 880 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). Therefore, we can reasonably expect that newspaper publishers such as PNI and Dow Jones "will be subjected to similar closure orders entered by the district courts...." *United States v. Criden (Criden. II),* 675 F.2d 550, 554 (3d Cir.1982). Because the underlying dispute is capable of repetition yet evading review, we will deny Publicker's motion to dismiss this appeal because of mootness, and now turn to the merits of this appeal.

## II.

Appellants PNI and Dow Jones claim that the district court's exclusion of the public and the press from the December 7, 1982 hearing concerning the petitions for temporary injunctions violated their common law and First Amendment rights of access to a civil trial without due process of law. They also claim that the district court's order sealing the transcript of this hearing similarly violated their common law and First Amendment rights of access

to judicial records without due process of law. However, Appellants concede that these rights are not absolute and may be regulated and even denied under certain circumstances so long as the denial is made pursuant to procedures that safeguard their right to due process of law. They insist, however, that the court below closed and sealed the transcript of the hearing in disregard of requisite procedural guarantees and therefore denied their common law and First Amendment rights of access to civil trial and judicial records without due process of law. We will address these issues *seriatim.*

## A. THE COMMON LAW

 The existence of a common law right of access to judicial proceedings and to inspect judicial records is beyond dispute. *United States v. Criden, (Criden I),* 648 F.2d 814, 819 (3d Cir.1981). This common law right of access to judicial proceedings and records usually has been considered by the Supreme Court in connection with criminal trials and proceedings. *See, Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 564–69, 580, n. 17, 100 S.Ct. at 2820–23, 2829, n. 17; *Gannett Co., Inc. v. DePasquale,* 443 U.S. at 368, 386, n. 15, 99 S.Ct. at 2898, 2908, n. 15; *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597–98, 98 S.Ct. 1306, 1311–12, 55 L.Ed.2d 570 (1978); and *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948).

However, an examination of the authority on which the Supreme Court relied in these cases reveals that the public's right of access to civil trials and records is as well established as that of criminal proceedings and records. Indeed, the Supreme Court itself recognized this in *Gannett Co., v. DePasquale,* 443 U.S. at 386, n. 15, 99 S.Ct. at 2908, n. 15. In *Gannett,* the Court acknowledged that the historical evidence on which petitioner and *amici* relied in arguing the existence of a criminal defendant's constitutional right to demand a public trial "is equally applicable to civil and criminal cases...." *Id.* The Court explained:

For many centuries, both civil and criminal trials have traditionally been open to the public. As early as 1685, Sir John Hawles commented that open proceedings were necessary so "that truth may be discovered in civil *as well as* criminal matters" (emphasis added). Remarks upon Mr. Cornish's Trial, 11 How.St.Tr. 455, 460. English commentators also assumed that the common-law rule was that the public could attend civil and criminal trials without distinguishing between the two.

*Id.* Therefore, we hold that appellants PNI and Dow Jones possess a common law right of access to civil trials. Although we could rest our decision on a common law right of access, the importance in guaranteeing freedoms at issue here compel us to reach the constitutional issues.

## B. THE FIRST AMENDMENT

█ It is more difficult to decide whether the First Amendment affords protection against the exclusion of the public from civil trials. The Supreme Court has held that the First Amendment guarantees the public and the press the right of access to criminal trials. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 580, 100 S.Ct. at 2829. In his plurality opinion in which a majority of the Court concurred, Chief Justice Warren Burger reasoned that the core purpose of the First Amendment is to assure "freedom of communication on matters relating to the functioning of government." *Id.* at 575, 100 S.Ct. at 2826. He observed that the manner in which criminal trials are conducted has been recognized by "the centuries-old history of open trials and the opinions of this Court," *Id.,* to be a central aspect of government. He also observed that the Bill of Rights

was enacted against a backdrop of the long history of trials being presumptively open. Public access to trials was then regarded as an important aspect of the process itself; the conduct of trials "before as many of the people as chuse to attend" was regarded as one of "the inestimable advantages of a free English

constitution of government." 1 Journals 106, 107.

*Id.* The Chief Justice thus concluded that "[i]n guaranteeing freedoms such as those of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees." *Id.*

In addition, the Chief Justice noted that the First Amendment guarantee of assembly assured the right of access to places traditionally open to the public for the purpose of exercising other First Amendment rights. *Id.* at 577-78, 100 S.Ct. at 2827-28. He concluded that "a trial courtroom also is a public place where the people generally—and representatives of the media—have a right to be present, and where their presence historically has been thought to enhance the integrity and quality of what takes place." *Id.* at 578, 100 S.Ct. at 2828 (footnote omitted). Therefore, the Court held that the "right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.'" *Id.* at 580, 100 S.Ct. at 2829 (footnote omitted) (*quoting Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972)).

The Chief Justice noted, however, that "[w]hether the public has a right to attend trials of civil cases is a question not raised by this case ...." *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 580, n. 17, 100 S.Ct. at 2829, n. 17. Moreover, in her concurring opinion in *Globe Newspaper Co. v. Superior Court for the County of Norfolk,* 457 U.S. 596, 611, 102 S.Ct. 2613, 2623, 73 L.Ed.2d 248 (1982), Justice Sandra Day O'Connor emphasized that she interpreted "neither Richmond Newspapers nor the Court's decision today to carry any implications outside the context of criminal trials." *Id.* Therefore, we must decide whether the Court's analysis in *Richmond Newspapers, Inc.* and in *Globe Newspaper Co.* leading to its recognition of a First Amendment guarantee of the public's and

press' right of access to criminal trials is applicable to civil trials.

The Supreme Court's recognition of a First Amendment right of access to *criminal* trials is predicated on "the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs.'" *Globe Newspaper Co. v. Superior Court*, 457 U.S. at 604, 102 S.Ct. at 2619 (quoting *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966)). Therefore, the Court declared that, "to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one." *Globe Newspaper Co. v. Superior Court*, 457 U.S. at 604–05, 102 S.Ct. at 2619–20.

In explaining why the First Amendment guarantees a right of access to criminal trials the Court emphasized two features of the criminal justice system. It noted that "the criminal trial historically has been open to the press and general public." *Id.* at 605, 102 S.Ct. at 2619. It also observed that "the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole." *Id.* at 606, 102 S.Ct. at 2620. Namely, access to criminal trials,

> enhances the quality and safeguards the integrity of the factfinding process ... fosters an appearance of fairness, thereby heightening public respect for the judicial process. And, in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

*Id.* (footnotes omitted). Our task, then, is to review the English and American legal authorities to determine whether they reveal a corresponding presumption of openness inhering in the civil trial which "plays a particularly significant role in the functioning of the judicial process and the government as a whole." *Id.*

Although Chief Justice Burger cautioned in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. at 580, n. 17, 100 S.Ct. at 2829 n. 17, that the question whether the public has a right of access to civil trials was not before the Court, he nevertheless noted "that historically both civil and criminal trials have been presumptively open." *Id.* A survey of the legal authorities explains the Chief Justice's conclusion.

Sir Edward Coke declared in the early Seventeenth century that the Statute of Marlborough of 1267 required court proceedings to be held in public: "These words [*In curia Domini Regis*] are of great importance, for *all Causes* ought to be heard, ordered, and determined before the Judges of the King's Courts *openly* in the King's Courts, *whither all persons may resort* ...." 2 E. Coke, Institutes of the laws of England 103 (6th ed. 1681) (emphasis added).

Writing almost 150 years later, Sir Matthew Hale not only observed that evidence is given in both civil and criminal trials "in the open Court and in the Presence of the Parties, their Attorneys, Council, and all By-standers, and before the Judge ·and Jury...." M. Hale, *History of The Common Law of England*, 163 (C. Gray ed. 1971), he also offered an explanation for the public nature of civil and criminal trials:

> *Ninthly*, The Excellency of this open Course of Evidence to the Jury in Presence of the Judge, Jury, Parties and Council, and even of the adverse Witnesses, appears in these Particulars: *1st*, That it is openly; and not private before a Commissioner or Two, and a couple of Clerks, where oftentimes Witnesses will deliver that which they will be ashamed to testify publickly.

*Id.* Hale served as authority for Williams Blackstone when he explained why trials generally were conducted in public:

> This open examination of witnesses *viva voce*, in the presence of all mankind, is

much more conducive to the clearing up of truth, than the private and secret examination taken down in writing before an officer, or his clerk, in the ecclesiastical courts, and all others that have borrowed their practice from the civil law, where a witness may frequently depose that in private which he will be ashamed to testify in a public and solemn tribunal.

3 W. Blackstone, *Commentaries* 373. Thus, more recent commentators agree that "one of the most conspicuous features of English justice, that *all* judicial trials are held in open court, to which the public have free access, ... appears to have been the rule in England from time immemorial." E. Jencks, *The Book of English Law* 73–74 (6th ed. 1967) (emphasis added). *See Richmond Newspapers v. Virginia,* 448 U.S. at 566–67, 100 S.Ct. at 2821–22.

The Supreme Court also recognized that this English common law right of access was transferred to the American colonies. Thus, Chief Justice Warren Burger stated:

> We have found nothing to suggest that the presumptive openness of the trial, which English courts were later to call "one of the essential qualities of a court of justice," *Daubney v. Cooper,* 10 B. & C. 237, 240, 109 Eng.Rep. 438, 440 (K.B. 1829), was not also an attribute of the judicial systems of colonial America.

*Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 567, 100 S.Ct. at 2822. Justice Potter Stewart similarly observed one year earlier:

> The experience in the American Colonies was analogous. From the beginning, the norm was open trials. Indeed, the 1677 New Jersey Constitution provided that any person could attend a trial whether it was "civil *or* criminal," Concessions and Agreements of West New Jersey (1677), Ch. XXIII, quoted in 1 B. Schwartz, The Bill of Rights: A Documentary History 129 (1971) (emphasis added). Similarly, the 1682 and 1776 Pennsylvania Constitutions both provided that "*all* courts shall be open," 1 Schwartz, *supra,* at 140, 271 (emphasis added).

*Gannett Co. v. DePasquale,* 443 U.S. at 386, n. 15, 99 S.Ct. at 2908, n. 15. In addition, Justice Lewis Powell declared that "[i]t is clear that the courts of this country recognize a *general right* to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications,* 435 U.S. at 597, 98 S.Ct. at 1312 (emphasis added). These conclusions rest on profuse authority. *See, e.g., In re Caswell,* 18 R.I. 835, 836, 29 A. 259 (1893); *Schmedding v. May,* 85 Mich. 1, 48 N.W. 201 (1891). *Park v. The Detroit Free Press,* 72 Mich. 560, 568, 40 N.W. 731, 734–35 (1888); *Cowley v. Pulsifer,* 137 Mass. 392 (1884).

The explanation for and the importance of this public right of access to civil trials is that it is inherent in the nature of our democratic form of government. *United States v. Mitchell,* 551 F.2d 1252, 1258 (D.C.Cir.1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc., supra,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Thus, Justice Oliver Wendell Holmes, when he served as a justice on the Massachusetts Supreme Court, declared that public access to civil judicial proceedings was "of vast importance" because of "the security which publicity gives for the proper administration of justice." *Cowley v. Pulsifer,* 137 Mass. at 394. "It is desirable that the trial of [civil] causes should take place under the public eye," Holmes continued,

> not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.

*Id.* *See also Joy v. North,* 692 F.2d at 893.

Wigmore on Evidence reaffirms the beneficial effects of public access to civil judicial proceedings identified centuries ago by Hale and Blackstone. Wigmore observes that public access "plays an important part

as a security for testimonial trustworthiness...." 6 J. Wigmore, *Evidence* § 1834, p. 435 (J. Chadbourn rev. 1976). Public proceedings are the means by which this testimonial of trustworthiness is achieved. Wigmore identifies other beneficial effects of public access to civil as well as criminal trials. It enhances the quality of justice dispensed by officers of the court and thus contributes to a fairer administration of justice:

> (a) Subjectively, a wholesome effect is produced, analogous to that secured for witnesses, upon all the officers of the court, in particular, upon judge, jury, and counsel. In acting under the public gaze, they are more strongly moved to a strict conscientiousness in the performance of duty. In all experience, secret tribunals have exhibited abuses which have been wanting in courts whose procedure was public.

*Id.* at 438 (footnote omitted). Public access to civil trials also provides information leading to a better understanding of the operation of government as well as confidence in and respect for our judicial system.

> (c) The educative effect of public attendance is a material advantage. Not only is respect for the law increased and intelligent acquaintance acquired with the methods of government, but a strong confidence in judicial remedies is secured which could never be inspired by a system of secrecy.

*Id.* (footnote omitted).

This survey of authorities identifies as features of the civil justice system many of those attributes of the criminal justice system on which the Supreme Court relied in holding that the First Amendment guarantees to the public and to the press the right of access to criminal trials in *Globe Newspaper Co. v. Superior Court, supra* and *Richmond Newspapers, Inc. v. Virginia, supra.* A presumption of openness inheres in civil trials as in criminal trials. We also conclude that the civil trial, like the criminal trial, "plays a particularly significant role in the functioning of the judicial process and the government as a whole." *Globe Newspaper Co. v. Superior Court,* 457 U.S. at 606, 102 S.Ct. at 2620. From these authorities we conclude that public access to civil trials "enhances the quality and safeguards the integrity of the fact-finding process." *Id.* It "fosters an appearance of fairness," *id.,* and heightens "public respect for the judicial process." *Id.* It "permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Id.* Public access to civil trials, no less than criminal trials, plays an important role in the participation and the free discussion of governmental affairs. Therefore, we hold that the "First Amendment embraces a right of access to [civil] trials ... to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one." *Id.* at 604–05, 102 S.Ct. at 2619–20. *See Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d at 1177–79.

Although the right of access to civil trials is not absolute, nevertheless, as a First Amendment right it is to be accorded the due process protection that other fundamental rights enjoy. *Accord, Globe Newspaper Co. v. Superior Court,* 457 U.S. at 606, 102 S.Ct. at 2620; *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 581, n. 18, 100 S.Ct. at 2830, n. 18; *see also Tavoulareas v. Washington Post Co.,* 724 F.2d 1010, 1017 (D.C.Cir.1984); *Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d at 1179. Therefore, to limit the public's access to civil trials there must be a showing that the denial serves an important governmental interest and that there is no less restrictive way to serve that governmental interest. *Globe Newspaper Co. v. Superior Court,* 457 U.S. at 606–07, 102 S.Ct. at 2620–21; *Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d at 1179.

In addition, there are certain exceptions to the presumptive openness of judicial proceedings. *Nixon v. Warner Communications, Inc.,* 435 U.S. at 598, 98 S.Ct. at 1312; *Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d at 1179. The

party seeking the closure of a hearing or the sealing of a transcript bears the burden of showing that the material is the kind of information that courts will protect and that there is good cause for the order to issue. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 529 F.Supp. 866, 890 (E.D.Pa.1981). Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. *Id.* at 891. The injury must be shown with specificity. *Id.*, *See In Re Iowa Freedom of Information Council*, 724 F.2d 658 (8th Cir.1983). The exception that is closest to this case is the protection of a party's interest in confidential commercial information, such as a trade secret, where there is a sufficient threat of irreparable harm. *Stamicarbon, N.V. v. American Cyanamid Co.*, 506 F.2d 532, 539–42 (2d Cir.1974).

### III.

From the foregoing discussion it becomes clear that the public and the press possess a First Amendment and a common law right of access to civil proceedings; indeed, there is a presumption that these proceedings will be open. The trial court may limit this right, however, when an important countervailing interest is shown. The question we must decide is whether the district court abused its discretion in denying PNI's and Dow Jones' right of access to the civil proceedings.

A trial court must satisfy certain procedural and substantive requirements before it can deny access to civil proceedings.

### A. PROCEDURAL REQUIREMENTS

■ Procedurally, a trial court in closing a proceeding must both articulate the countervailing interest it seeks to protect and make "findings specific enough that a reviewing court can determine whether the closure order was properly entered." *See Press-Enterprise Co. v. Superior Court of California, Riverside County*, — U.S. —, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984); *In re Iowa Freedom of Information Council*, 724 F.2d at 662. Substan-

tively, the record before the trial court must demonstrate "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Court of California, Riverside County*, 104 S.Ct. at 824.

In this case the issue of disclosing the confidential information arose on December 6, 1982 when Cohen filed his Motion for Preliminary Injunction to postpone the December 8, 1982 stockholders' meeting until Publicker disclosed the information in question. Cohen's motion raised two questions: Whether the "sensitive" information should be kept confidential by a court order and, if not, whether the stockholders' meeting should be postponed until it was disclosed. The district court held a closed hearing to decide Cohen's motion on December 7, 1982, and it was from this hearing that the court excluded the public and appellants' reporters.

■ In deciding whether the district court abused its discretion in closing the hearings, we will first examine the record to determine whether the procedural requirements have been satisfied. The district court articulated a compelling countervailing interest it sought to protect by holding a closed hearing on Cohen's motion seeking the disclosure of certain "sensitive" or "confidential" information. The district court articulated this interest very clearly when it said: "[i]f I were to permit the newspapers in here you would be usurping my function in deciding the case before I did by revealing the information, even though I [might] ultimately decide that it shouldn't be revealed." JA at A134–35.

In *Crystal Grower's Corp. v. Dobbins*, 616 F.2d 458, 461 (10th Cir.1980), the court noted that there are circumstances where "disclosure ... would effectively nullify their claim of privileges without a hearing on the merits." *Globe Newspapers*, 457 U.S. at 609, n. 25, 102 S.Ct. at 2622, n. 25, *In re Iowa Information Council*, 724 F.2d at 662, *see United States v. Hubbard*, 650 F.2d 293 (D.C.Cir.1980). For this reason it

would be in the sound discretion of the district court to consider an alleged confidential problem *"in camera* but with counsel present and on the record." *See Press-Enterprise Co. of California, Riverside County v. Superior Court,* 104 S.Ct. at 825; *In re Iowa Information Council,* 724 F.2d at 662. Parties are thus afforded the opportunity to resolve their disputes in court without automatically destroying the confidentiality of certain information.

If after the closed proceedings, the court deems the countervailing interests insufficient to overcome the presumption of openness, it may make a transcript of the proceedings available. *Id.* Thus, "people not actually attending trials can have confidence that standards of fairness are being observed...." *Id.* 104 S.Ct. at 823.

We do not conclude however that disclosing the contents of a transcript always acts as "an adequate substitute for the presence of reporters and the public at the hearing." *In Re Iowa Freedom of Information Act,* 724 F.2d at 663. "[T]he availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom." *Id.* (*quoting Richmond Newspapers, Inc., supra,* 448 U.S. at 597 n. 22, 100 S.Ct. at 2838 n. 22 (Brennan, J., concurring in the judgment)). Therefore, a district court in deciding whether to conduct a proceeding *in camera* must not relax the standard necessary to close a proceeding simply because a transcript of that closed proceeding can be made available at a later date.

In this case, however, we believe the district court acted properly in excluding the public from that part of the hearing that concerned the question of whether certain "sensitive" information should be kept confidential by a court order.

Although the district court satisfied its procedural burdens with regard to articulating countervailing interests to be protected and making specific findings concerning disclosure of the alleged confidential information, it failed to satisfy its procedural burden with regard to Publicker's Motion for Preliminary Injunction. Publicker's Motion for Preliminary Injunction sought to prevent Cohen from soliciting and voting proxies at the December 8, 1982 stockholders' meetings. This motion was considered in the same closed hearing that considered disclosure of·alleged "confidential" information; the public also was excluded from hearing arguments on Publicker's motion. Thus, arguments relating to two separate motions were intermixed and closed to the public.

The district court, however, did not explain why it closed the hearing with regard to Publicker's Motion for Preliminary Injunction. No countervailing interests were articulated, nor were specific findings made to explain the closure as to this matter. Finally, no alternatives to closure were considered. Thus, the district court abused its discretion by closing that portion of the hearing without explaining its reasons.

■ In addition to challenging the closure of the hearing, appellants argue that it was improper for the district court to seal those portions of the transcript of the December 7, 1982 hearing that related to the confidential information at issue and to order counsel for PNI and Dow Jones not to disclose to their clients those portions of the sealed transcript which they were given as part of Publicker's memorandum of law in support of its motion to seal the record.

The district court issued these orders without explanation. As stated earlier a district court is required to make "findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press Enterprise Co. v. Superior Court of California, Riverside County,* 104 S.Ct. at 824. In this case the district court's failure to articulate its reasons leaves this court to speculate—an exercise in which we ordinarily would not engage. We will indulge in speculation, however, to demonstrate the necessity for a district court to articulate the reasons supporting its decision to seal transcripts and to order non-disclosure.

First, it is possible that the district court entered the orders to seal and to not disclose because it still wished to preserve its ability to decide the question of confidentiality initially presented to it during the December 7, 1982 hearing. As it stated during that hearing

> [i]f I were to permit the newspapers in here you would be usurping my function in deciding the case before I did by revealing the information, even though I [might] ultimately decide that it shouldn't be revealed.

JA at A134–35. We would find this articulation sufficient to justify the district court's orders for the purpose of preserving its ability to decide the question of confidentiality. Thus, if it had not yet decided the question of confidentiality as of January 6, 1983 when it ordered certain portions of the December 7, 1982 hearing sealed and ordered counsel for PNI and Dow Jones not to disclose those portions of the sealed transcript which they were given as part of Publicker's memorandum of law in support of its motion to seal the record, we would regard these orders as mechanisms with which to buttress the district court's attempt to preserve secrecy while it deliberated on the question of confidentiality. For that purpose we would consider these orders to be proper.

Second, it is possible that the district court's orders of January 6, 1983, issued almost one month after the hearing on the issue of confidentiality, constituted its decision on the merits as to that question. If that reason underlies these orders, then the previously articulated reason of preserving its ability to decide the question of confidentiality is erased. Thus, the district court would be obliged to articulate a countervailing interest to be served by issuing these orders after the question of confidentiality had been decided. Having failed to do so, we would be inclined under this view to find the district court's issuance of these orders without explanation to be an abuse of discretion.

In short, because the district court failed to articulate the reasons explaining its Jan-

uary 6, 1983 orders, this court is left to speculate on this issue, and it is this type of appellate speculation which we must make in discerning the district court's rationale that is unacceptable. Here, the district court's conclusion could be predicated on either a valid rationale or an invalid rationale, and we cannot assume that its final conclusions were necessarily based on the valid rationale. Rather, we conclude that the record before us concerning the January 6, 1983 orders does not "provide a firm base for an appellate judgment that discretion was soundly exercised." *Criden*, 648 F.2d at 819.

## B. SUBSTANTIVE REQUIREMENTS

In order for a reviewing court to uphold the trial court's decision to exclude the public from proceedings or transcripts of proceedings, the record must demonstrate "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 824. Unless such an overriding interest exists, there is a presumption that the proceedings will be open to the public. *Id.*

The overriding interest can involve the content of the information at issue, the relationship of the parties, or the nature of the controversy. For example, an interest in safeguarding a trade secret may overcome a presumption of openness. *See Zenith Radio Corp. v. Matsushita Electric Industrial Corp.*, 529 F.Supp. at 890. The content of the information is critical in that context. However, in the situation where a plaintiff seeks an injunction to prevent his former lawyer from disclosing certain information arguably within the attorney-client privilege, it is the relationship between the parties not the content of the information which might overcome the presumption of openness. *See DuPont v. Masland*, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917). A similar situation would be presented where there is a binding contractual obligation not to disclose certain information which to the court seems innocuous but newsworthy; in that

situation unbridled disclosure of the nature of the controversy would deprive the litigant of his right to enforce a legal obligation.

■ In the case before us we are concerned only with the content of the information from which the public was excluded. Arguments regarding the relationship of the parties on the nature of the controversy have not been presented to this court for consideration. The sensitive and "confidential" information in this case involves Publicker's subsidiary's manufacturing of scotch without a required permit.

We believe, however, that the closed hearing was not "narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Court of California, Riverside County*, 104 S.Ct. at 824.

The hearing's closure extended too far when it included consideration of Publicker's Motion for a Preliminary Injunction. No overriding interest sufficient to overcome the presumption of openness as to consideration of this issue is articulated in the record before us, and we can think of no such interest. Moreover, there is no indication why a less restrictive alternative such as a bifurcated hearing was not considered. Therefore, we believe the district court abused its discretion by excluding the public and press from this aspect of the hearing.

■ We turn now to the question concerning the sealing of the transcripts. As stated above, the "sensitive" information at issue involved the fact that a subsidiary of Publicker was manufacturing scotch without a permit. Because the district court failed to articulate overriding interests based on specific findings showing that the sealing of the transcripts essential to articulated interests of Publicker and because the district court failed to consider less restrictive means to keep this information from the public, we need not reach the merits of this question. These errors alone constitute an abuse of discretion.

However, we will point out that the "sensitive" information at issue here is not the kind of confidential commercial information that courts have traditionally protected, *e.g.,* trade secrets. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 529 F.Supp. at 890, n. 42. It simply involves a matter of poor management. The Second Circuit recently held that "potential harm ... in disclosure of poor management in the past .... is hardly a trade secret." *Joy v. North,* 692 F.2d at 894.

In the absence of other considerations, such as an enforceable confidentiality agreement, federal courts should not deny access to trial evidence of a bad business practice such as that exercised by Publicker's subsidiary in failing to procure approval from Customs and Excise to introduce the enzyme in its production of scotch whiskey. The presumption of openness plus the policy interest in protecting unsuspecting people from investing in Publicker in light of its bad business practices are not overcome by the proprietary interest of present stockholders in not losing stock value or the interest of upper-level management in escaping embarrassment.

This case reflects the difficulty of the time pressures of a trial judge who, because of the tide of events that could not be stopped, had to decide many of the critical policy and constitutional questions within minutes. We as an appellate court, on the other hand, have had the benefit of less urgent time constraints as well as the benefit of the work product of counsel on appeal who within this more relaxed time frame were able to thoughtfully research the issues, prepare briefs and articulate theories far more precisely than those presented to the trial court. Moreover, we even have relied on and received additional guidance from a Supreme Court case decided after the oral argument in this matter had been heard by this court.

Of course we cannot expect trial judges to have the wisdom of Solomon or to expect them to be able to anticipate precisely those unarticulated doctrines still in the womb of time. Nonetheless, our appellate function requires us after more time for reflection to articulate as best we can the

proper standard without in any way impugning the district court which attempted to make the wisest decision possible within its limited time frame. Thus, we regard this opinion as announcing what we believe the law to be rather than a critique on the trial judge's performance.

The district court's orders of January 6, 1983 will be reversed. The case will be remanded for proceedings consistent with this opinion.