## Katz v. Katz

*Howard Gittis and David Hofstein*, for plaintiff.
*Theodore R. Mann and Morris Gerber*, for defendant.

DAVENPORT, *J.*, August 13, 1985 — Plaintiff Barbara Katz filed a complaint in divorce on April 6, 1981, and although now of long standing, little progress has been made towards a resolution of the litigation in the four-plus years this matter has been before the court.[1] In this appeal, the court is dealing solely with the question of whether it was proper for the court to direct that all trial proceedings be held in an open courtroom, rather than in camera.

On February 4, 1985, at the behest of defendant Harold Katz, the undersigned entered an oral order denying the public and press access to the proceedings of this action according to the time-honored practice in Montgomery County. The Philadelphia Newspapers, Inc.[2] appealed this order to Judge Beck of the Superior Court on that same day. Philadelphia Newspapers contended that this matter was of immediate public importance and averred that the "rights of the press and public, and public confidence in the judicial system, are undermined each

---

1. On May 30, 1985, the court granted defendant Harold Katz's petition for bifurcation, and entered a divorce decree on May 31, 1985. Barbara Katz has appealed both the bifurcation order and the divorce decree.

2. Philadelphia Newspapers, Inc. is to be considered a party to this action for the limited purpose of contesting the closure of the courtroom.

day that civil proceedings are permitted to continue behind closed doors under a cloak of total secrecy."

On February 5, 1985, after a hearing before Judge Beck attended by counsel of all concerned parties,[3] the Honorable Phyllis Beck of the Pa. Superior Court ordered that this court hold an immediate hearing on the closure issue.[4] Said hearing was duly held on February 8, 1985, and by order dated May 7, 1985, the court decreed that all further proceedings in this matter could be held in an open courtroom. It is this May 7, 1985 order which is the subject of the instant appeal.[5]

## DISCUSSION

Defendant argues that the "great weight of authority" favors closure of the courtroom in a divorce context. This court tends to agree with defendant inasmuch as it has always appeared to us that these type of problems are best resolved in camera. It was only with great reluctance that this court decided to open the court in these proceedings.

Defendant based his request to close the courtroom on three grounds. Defendant does not wish:

---

3. Barbara Katz has at all times been in agreement with the position of Philadelphia Newspapers, Inc. and has testified to that effect.

4. See the copy of Judge Beck's order attached.

5. Subsequent to May 7, 1985, the court entered two additional orders which are of import to this appeal. On May 22, 1985, the court ordered that the transcripts of the hearings held on February 4 and 5, 1985, were to be released to plaintiff's counsel only on condition that they be held confidential until the 30-day appeal period from the May 7, 1985 order had expired. On June 11, 1985, the court entered a second order which continued the effect of the May 7, 1985 order. Under the June 11 order, the entire record and all further proceedings are to remain confidential until the conclusion of the instant appellate review.

(1) to have the contents of his federal income tax returns revealed; (2) to have his private life laid before the general public; and (3) to release evidence regarding the valuation of stock in his company, Nutri/Systems, Inc.[6] In terms of the closure issue, the court found that these arguments could be balanced on a fine point. One was essentially meritless, another bolstered defendant's position, while the third basically left the court in a quandary as to how it should rule.

On the question of income tax returns, defendant did not convince the court that he was deserving of relief. Defendant stated at the February 8, 1985 hearing that he doesn't want any public mention of certain tax shelters. However, defendant admitted on cross-examination that a list of these tax advantages appeared in an article in the March 29 — April 4, 1982 issue of The Philadelphia Business Journal. It also appeared that defendant's annual salary as an officer of Nutri/Systems and any capital gains he might realize are included in financial statements delivered to Nutri/Systems shareholders. It is also possible to discover defendant's dividend income from these statements. In addition, these financial reports must be delivered to the press. Thus in this area, what defendant claimed he wanted kept private was already public information.

Furthermore, defendant cannot ignore the fact that the relevant tax returns were filed jointly with plaintiff. Plaintiff testified at the February 8 hearing that she is perfectly willing to have the returns released to the press. According to plaintiff, it makes

---

6. At the time this action was instituted, defendant was the majority shareholder and Chief Executive Officer of Nutri/Systems, a corporation which controls a chain of weight-reduction franchises.

no difference to her whether defendant agrees with this course or not. Since plaintiff has a right to take such steps, it matters little what defendant's position is. Even with closure, defendant's tax return could still be made public.

In contrast, defendant's complaint that his private life should not be bandied about in public is certainly legitimate. The United States Supreme Court has held that the right of marital privacy is within the penumbra of the specific guarantees of the Bill of Rights. Griswold v. Connecticut, 381 U.S. 479, (1965). Defendant is entitled to protection from the prying eyes of the public in terms of what goes on in his own home.

In fact, the court does not comprehend Philadelphia Newspapers' insistence on publicizing this aspect of the trial. Defendant's marital difficulties are certainly not "newsworthy" in the sense in which that word is normally understood. It appeared to the court that publicity of defendant's private life was simply another hackneyed attempt by the press to invoke sensationalism as a means of selling papers. While this might be good business sense, it is not good journalism.

The court quickly discounted the argument of Philadelphia Newspapers that much of defendant's private life is already known to the public anyway. Reference was made to the fact that reports of defendant's relationship with his fiancee have appeared in the press from time to time. However, the court noted that this information was not freely given, that it was practically levered out of defendant, and the various articles tended to be inaccurate. Finally, in the court's view, any testimony relative to defendant and his fiancee is irrelevant to these proceedings.

In sum, the court opined that Griswold was controlling re publicity of defendant's marriage to plaintiff, while how defendant and his fiancee choose to live their lives is of no concern to anyone but them.

Defendant also offered testimony which created a bridge between his first and second objections, but which the court felt belonged more appropriately with the latter. Defendant averred that continued discussion of his wealth would endanger his family. The court sympathizes with defendant on this point. While defendant, as owner of the Philadelphia 76ers, a professional basketball team, and the visible head of a successful corporation, is in a very real sense a public figure, he need not be exposed more than is necessary to the less enviable features which accompany that public status. The more publicity defendant receives in the setting of this action, the more likely it becomes that he and his family will be subjected to some form of harassment. This should not be.

In his ultimate argument, defendant claimed that his obligation to do everything in his power as chief executive officer of Nutri/Systems, Inc. to prevent misleading financial data from appearing in the public press outweighed any constitutional or common-law right to an open trial. The court did not consider this argument as being persuasive either one way or the other.

On the one hand, problems could arise if unsophisticated investors misinterpreted any valuation testimony to their detriment. Given the widespread public knowledge of Nutri/Systems, Inc., this is a very real possibility. On the other hand, it appeared to the court that defendant could minimize, if not eliminate, the danger of misleading investors by providing an honest, accurate appraisal of Nutri/System stock whenever it is demanded. Due

to the uncertainty engendered by this question, the court opted to reserve judgment on it and reached its conclusion via another route.

Two factors eventually tipped the balance towards holding an open trial. One was the decision of the United States Court of Appeals, Third Circuit, in Publicker Industries, Inc. v. Cohen, 733 F.2d 1059, (1984). The court in Publicker held that, at both common law and under the First Amendment, the public and press have a right of access to civil proceedings. In his concise statement of matters complained of on appeal, defendant argues that the rule in Publicker does not apply to divorce and equitable distribution matters, because "the common law has developed differently in respect of such trials." Intuitively, the court is in accord with this proposition. Unfortunately, the language of Publicker does not readily admit of such an interpretation. The court in Publicker stated unequivocally that only extraordinary circumstances will justify closure of the courtroom, whether the matter is civil or criminal. The court felt bound by this determination.

The second factor involves the February 5, 1985 order of Judge Beck directing the court to hold a hearing on the closure issue. In this court's view, because of the speed of the court's response to the appeal, implicit in that order was an unspoken instruction that all proceedings in this matter ought to be held in an open court. The court felt constrained to follow this tacit directive.

## CONCLUSION

Divorce and equitable distribution proceedings are traditionally heard in camera by a master or a judge sitting without a jury. Further, there is no right under Pennsylvania law to a trial by jury in a

divorce action. The decision whether to grant or refuse a jury trial in divorce rests in the sound discretion of the court. Bowne v. Bowne, 9 D.&C. 652 (1927). While the granting of a request for a jury trial is discretionary with the court, the request must be refused where public morals will be prejudiced by a jury trial. 23 P.S. §305(b). This limitation has been interpreted to include instances where there are charges of adultery, Holman v. Holman, 19 D.&C. 278 (1933), where public disclosure would adversely affect children of the marriage, Krause v. Krause, 27 D.&C.2d 322 (1961), and where testimony might be such as to arouse morbid curiosity. Bzura v. Bzura, 59 D.&C. 183 (1947). Finally, Montgomery County Local Rule §1920.51(f) (8) provides that all papers filed in divorce actions shall be impounded immediately by the prothonotary. The papers are to be open for inspection only to members of the Montgomery Bar, a party to the action and others by order of the court.

Outside of divorce and equitable distribution issues, Pa.R.C.P. §223(a) (4) allows a court in its discretion to regulate or exclude "the public or persons not interested in the proceedings whenever the court deems such regulation or exclusion to be in the interest of the public good, order, or morals." In this context it has been held that a defendant's constitutional right to an open and public trial was not violated where the public was barred admission to the courtroom during medical testimony relating to matters of a personal and embarassing nature to plaintiff. Delcamp v. Hower, 57 Berks 17 (1965). See also Air Products and Chemicals, Inc. v. Johnson, 296 Pa. Super. 405, 442 A.2d 1114 (1982).

As against the foregoing the court contrasted the rigid holding of Publicker Industries v. Cohen, supra. Although the United States Supreme Court

has yet to rule definitively on the issue, the court in Publicker unhesitatingly announced that there exists a "presumptive right of access" to civil as well as criminal trials. The court regarded this pronouncement as controlling in the instant case. Thus, the decision in Publicker divested this court of its discretion, not necessarily its inclination, to issue a closure order, hence the court decreed that all further proceedings would be held in open court.

## ORDER

And now, this May 7, 1985, in compliance with the order of the Superior Court dated February 5, 1985, Phyllis W. Beck, J., and a hearing held in accordance therewith, it is hereby ordered and decreed that all further proceedings in this matter shall be held in an open court room.