800 F.2d 339
 55 USLW 2171, 13 Media L. Rep. 1450
 BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, a
national banking association
v.
HOTEL RITTENHOUSE ASSOCIATES, a Pennsylvania limited
partnership, Jack L. Wolgin, Jack L. Wolgin Associates,
Inc., a Pennsylvania corporation, both general partners of
Hotel Rittenhouse Associates, and Jack L. Wolgin and Muriel
Wolgin, husband and wife
v.
NILSI, N.V., Abohar Investments, N.V., Khalid Y. Al-Marzook,
Jassim Y. Al- Marzook, and Faisal Y. Al-Marzook.
Appeal of FAB III CONCRETE CORPORATION.
FAB III CONCRETE CORPORATION, Appellant,
v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION.
 Nos. 85-1753, 85-1754.
 United States Court of Appeals,
Third Circuit.
 Argued June 4, 1986.
Decided Sept. 8, 1986.
 
 Leonard J. Bucki (argued), Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., for appellant, Fab III Concrete.
 Harold E. Kohn (argued), Joseph C. Kohn, Kohn, Savett, Marion & Graf, Philadelphia, Pa., for appellees, Hotel Rittenhouse Associates et al. and Bank of America Nat. Trust and Sav. Ass'n.
 Before ALDISERT, Chief Judge, GARTH and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 In this appeal, we are faced with an issue that this court has confronted with increasing frequency in recent years: under what circumstances documents filed in the district court may be sealed from public access.
 
 I.
 Facts and Procedural History
 
 2
 The dispute that forms the basis for this case arose out of the construction of the Hotel Rittenhouse in Philadelphia, which is not yet completed. The factual record before us is spare. There appears to be little dispute about the relevant historical facts, which we present briefly from the appellant's perspective.
 
 
 3
 In 1981, the Bank of America (the Bank), contracted with Hotel Rittenhouse Associates (HRA) and other developers to finance the construction of the hotel. FAB III, the appellant here, was the concrete contractor on the project.
 
 
 4
 In June 1983, the Bank filed suit against HRA, its partners and some involved individuals (referred to collectively as HRA) in the United States District Court for the Eastern District of Pennsylvania to foreclose on the Hotel Rittenhouse property and to collect on a loan. HRA counterclaimed on numerous state and federal law grounds.[1]
 
 
 5
 In April 1984, FAB III filed suit in federal court against the Bank, but not against HRA, seeking over $800,000 on the basis of an alleged assurance by the Bank of direct payment for FAB III's HRA work. The Bank moved to dismiss on the ground that HRA was an indispensable party and that joinder of HRA would destroy diversity of citizenship. Apparently, this motion has never been decided.
 
 
 6
 The Bank-HRA action proceeded to trial in January 1985. Before the case was sent to the jury, the parties reached a settlement and the jury was discharged. At the parties' request, the settlement agreement was filed under seal in the district court. Prior to this time, all proceedings in the litigation had been open to the public.
 
 
 7
 Shortly thereafter, there was a disagreement between the Bank and HRA about the settlement. On March 11, 1985, HRA filed a "Motion to Enforce Settlement Agreement." The Bank responded the next day with a similar motion. A series of documents regarding this dispute was filed under seal in the district court. According to the appellees' brief, release of the documents filed to enforce the settlement would reveal the contents of the settlement agreement.
 
 
 8
 In March and April 1985, the district court rendered a series of orders in the Bank-HRA litigation which apparently were pursuant to the motions asking it to enforce the settlement agreement. On March 25, the court gave judgment for the Bank against HRA for over 38 million dollars on one count of its complaint and dismissed all other counts of the Bank's claim and all of HRA's counterclaims. This judgment also ordered the Hotel Rittenhouse property sold at a Marshal's sale and set some of the terms of the sale. App. at 71a-73a. On April 12, the court filed another order setting the terms of payment for the Marshal's sale. The district court docket sheet also shows an entry on April 26 that "Order of Court is Filed Under Seal and Not to be Opened Until Further Order." The subject of this order is not otherwise explained but FAB III surmises that it refers to another part of the district court's judgment.
 
 
 9
 At about this time, FAB III began its efforts to obtain the settlement agreement and the documents filed in federal court to enforce the settlement. In April 1985, FAB III and other creditors of HRA met with the district court and requested it to unseal the documents. This request was denied without a written order.
 
 
 10
 In June 1985, FAB III moved to submit its dispute with the Bank to arbitration before the American Arbitration Association. The district court stayed the federal proceedings while the arbitration proceeded. The arbitration is still pending.
 
 
 11
 On July 1, 1985, FAB III filed a complaint in state court against the Bank and HRA charging them with a continuing conspiracy to deny it money owed for its work on the Hotel Rittenhouse project. In that complaint, FAB III charges that as part of the conspiracy "the Bank and the Wolgin Group [HRA] agreed to seal certain portions of the otherwise public proceedings in the federal court action." App. at 15a.
 
 
 12
 Shortly thereafter, FAB III filed a formal motion with the district court to unseal the settlement documents. Following what FAB III's brief characterizes as "an informal conference in chambers," see Brief of Appellant at 9, the court denied the motion to unseal. In a one-paragraph order, the court stated that it had weighed "the public interest in access to judicial records," as well as FAB III's interest in access to the settlement, against "the public and private interests in settling disputes" and found that the latter interest was paramount. See App. at 89a-90a. FAB III appeals the denial of its motion to unseal.[2]II.
 
 Scope of the Order
 
 13
 As a preliminary matter, we must determine whether the court's order denied access only to the settlement agreement or whether it also reaffirmed the earlier order sealing the motions and related documents. The written motion filed by FAB III was "to unseal docket and court records," and alleged that "[n]o public interests are served by the sealing of any portions of this Court's records herein." App. at 9a, 10a. In their opposing memorandum filed in the district court, HRA and the Bank treated FAB III's motion to unseal as directed to the motions to enforce the settlement agreement and related papers, as well as the settlement agreement itself. For example, that memorandum argued, "the only material not open to the public is the parties' settlement agreement and certain motions and briefs filed after settlement regarding interpretation of the agreement which disclosed its terms." App. at 26a. However, the district court's order of November 7, 1985 described the motion of FAB III as one "to unseal the agreement of settlement" and denied "FAB III's motion to unseal the agreement of settlement." The district court may not have distinguished between the motions to enforce the settlement agreement and the agreement itself because, as the brief of appellees HRA and Bank concedes, the "several motions and briefs ... filed [in the district court] requesting the Court to enforce the settlement agreement ... disclosed the terms of the settlement agreement." Brief of Appellees at 5.
 
 
 14
 The briefs for all parties on appeal have treated the district court's order as denying access to the motions to enforce the agreement, as well as to the settlement agreement itself. Moreover, the appellees' brief states the issue for review as, "Whether the District Court abused its discretion in denying a motion to unseal a confidential settlement agreement and certain post-settlement motions, briefs and orders, which disclose the terms of the settlement agreement." Id. at 1 (emphasis added). Therefore, we regard as disingenuous the belated contention by counsel for the appellees, expressed at oral argument, that the district court's order applies only to the settlement agreement and leaves unresolved FAB III's motion to unseal the motion papers.
 
 
 15
 In the first place, the district court's order denied FAB III's motion in its entirety. In the second place, the appellees never suggested in this court that because part of the motion remained pending, the matter was not ripe for disposition by this court. We will construe the district court's order as the parties have construed it in their written position before this court and as the district court apparently intended it, i.e., as a refusal to unseal not only the settlement agreement that was filed of record in the district court in civil action No. 83-2809 but also the motion papers filed of record in that court seeking to enforce the settlement agreement, which papers disclose all or part of the terms of that settlement agreement.
 
 III.
 Discussion
 
 16
 FAB III bases its claim for access to the documents filed in the district court on the common law right of access, rather than on the First Amendment. The right of the public to inspect and copy judicial records antedates the Constitution. Criden I, 648 F.2d at 819 (citing United States v. Mitchell, 551 F.2d 1252, 1260 (D.C.Cir.1976)).
 
 
 17
 The Supreme Court reaffirmed the common law right of access to judicial records and proceedings in Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), where it held that there was a presumption in favor of access to "public records and documents, including judicial records and documents." Id. at 597, 98 S.Ct. at 1312 (footnotes omitted); see also id. at 602, 98 S.Ct. at 1314.
 
 
 18
 This court first considered that right of access in Criden I, where we held that there was a "strong presumption" that the public and the media were entitled to access to tapes played during the criminal trial of two of the Abscam defendants. 648 F.2d at 823. See also United States v. Martin, 746 F.2d 964 (3d Cir.1984) (access to audiotapes introduced in evidence in criminal case governed by Criden I ). We have also held that the common law presumption of access encompasses as well all "civil trials and records." Publicker Industries, Inc. v. Cohen, 733 F.2d 1059, 1066-67 (3d Cir.1984). More recently, we held that "the common law right of access to judicial records enunciated in Criden I is fully applicable to transcripts of sidebar or chambers conferences in criminal cases at which evidentiary or other substantive rulings have been made." United States v. Smith, 787 F.2d 111, 115 (3d Cir.1986) (footnote omitted) (Smith II ).
 
 
 19
 Other opinions in this court have grounded access to court hearings on the First Amendment. In United States v. Criden, 675 F.2d 550 (3d Cir.1982) (Criden II ), we held that there is a First Amendment right of access to pretrial criminal proceedings. In Publicker, we explicitly based our holding that the press and the public could have access to a hearing in a civil proceeding and the transcript thereof on the First Amendment right of access as well as the common law, 733 F.2d at 1067-71.
 
 
 20
 It follows from our decisions in Criden I, Smith II, and Publicker that the common law presumption of access applies to motions filed in court proceedings and to the settlement agreement between HRA and the Bank which they filed and submitted to the district court for approval. Therefore, we need not decide whether such a right might also be grounded on the First Amendment, and decisions restricting access to other categories of records under a construction of the First Amendment are inapplicable here. See Capital Cities Media, Inc. v. Chester, 797 F.2d 1164 (3d Cir.1986) (in banc) (investigative records of state environmental agency); First Amendment Coalition v. Judicial Inquiry and Review Board, 784 F.2d 467 (3d Cir.1986) (in banc) (records of judicial inquiry board).
 
 
 21
 HRA and the Bank argue that a settlement agreement is a nonpublic aspect of litigation that "may properly be sealed from strangers to the agreement." Brief of Appellees at 12. They rely on the Supreme Court's decision in Seattle Times v. Rhinehart, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). We find that case inapposite. In Seattle Times, the Court held that the First Amendment did not preclude the district court from entering a protective order limiting disclosure of the products of pretrial discovery. Id. at 37, 104 S.Ct. at 2209-10. Such discovery, however, which is ordinarily conducted in private, stands on a different footing than does a motion filed by a party seeking action by the court.
 
 
 22
 In United States v. Smith, 776 F.2d 1104, 1111-12 (3d Cir.1985) (Smith I ), we rejected the argument that under Seattle Times, the bill of particulars was like civil discovery to which there was no right of access. We held that a bill of particulars is more akin to an indictment, that public access to an indictment is protected by the First Amendment and the common law right of access to the judicial process, and that denial of access must be justified by overriding interests. Similarly, unlike the civil discovery materials at issue in Seattle Times, a motion or a settlement agreement filed with the court is a public component of a civil trial. As in the cases involving trial rulings or evidence admitted, the court's approval of a settlement or action on a motion are matters which the public has a right to know about and evaluate.[3]
 
 
 23
 Just as the right of access is firmly entrenched, so also is the correlative principle that the right of access, whether grounded on the common law or the First Amendment, is not absolute. Our opinions may be read to suggest that there are somewhat different standards, depending on whether access is sought under the common law presumption or under the First Amendment. In Publicker, we required the party opposing access to show " 'an overriding interest based on findings that closure is narrowly tailored to serve that interest.' " 733 F.2d at 1073. This standard was taken from Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984), a First Amendment case. In Criden I, we held the strong common law presumption of access must be balanced against the factors militating against access. 648 F.2d at 818. See also United States v. Criden, 681 F.2d 919, 921 (3d Cir.1982) (Criden III ). The burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption.
 
 
 24
 Because we base our decision in this case on the common law right of access, we will apply the balancing approach articulated in Criden I and Criden III, and do not reach the issue whether that standard differs from that to be applied under the First Amendment. See Smith I, 776 F.2d at 1112.
 
 
 25
 The district court was cognizant that its decision required it to balance the factors favoring secrecy against the common law presumption of access. In denying FAB III's motion for access to the settlement documents, the court held that the "public and private interests in settling disputes" outweighed the "public interest in access to judicial records" and FAB III's private interest in knowing the terms of the settlement. App. at 89a-90a.
 
 
 26
 The balancing of the factors for and against access is a decision committed to the discretion of the district court, see Nixon v. Warner Communications, Inc., 435 U.S. at 599, 98 S.Ct. at 1312, although it is not generally accorded the narrow review reserved for discretionary decisions based on first-hand observations. Criden I, 648 F.2d at 818. Thus, the issue before us is whether the district court abused its discretion in holding that the judicial policy of promoting the settlement of litigation justifies the denial of public access to records and proceedings to enforce such settlements.
 
 
 27
 We acknowledge the strong public interest in encouraging settlement of private litigation. Settlements save the parties the substantial cost of litigation and conserve the limited resources of the judiciary. In order to encourage the compromise and settlement of disputes, evidence of settlements or offers of settlement are ordinarily not admissible in federal proceedings. See Fed.R.Evid. 408 and advisory committee note thereto; Fed.R.Civ.P. 68. Thus, it is likely that had HRA and the Bank chosen to settle and file a voluntary stipulation of dismissal, as provided in Rule 41(a)(1) of the Federal Rules of Civil Procedure, they would have been able to prevent public, and even FAB III's, access to these papers. That is not the course the parties chose.
 
 
 28
 Instead, HRA and the Bank filed their settlement agreement in the district court, because, as they frankly concede, they anticipated that they would disagree on the terms, and would want recourse to the court. That, of course, is precisely what occurred.
 
 
 29
 Judge Garth has written an interesting and vigorous essay about the importance of settlement to the overburdened court systems of this country. Since the proposition is self-evident, it is intended to, and undoubtedly will, touch a sympathetic chord in the hearts of all judges who, after all, bear much of the burden of the litigation explosion to which Judge Garth refers.
 
 
 30
 Noteworthy, however, is the fact that Judge Garth practically ignores the relevant posture of the case before us. This is not like FDIC v. Ernst & Ernst, 677 F.2d 230 (2d Cir.1982), which he relies on, where there was an effort to unseal a settlement agreement made two years earlier. Here, there were motions filed and orders entered that were kept secret, in direct contravention of the open access to judicial records that the common law protects. FAB III began its efforts to unseal the court papers almost immediately after these court documents were filed and sealed.
 
 
 31
 In the name of encouraging settlements, Judge Garth would have us countenance what are essentially secret judicial proceedings. We cannot permit the expediency of the moment to overturn centuries of tradition of open access to court documents and orders.
 
 
 32
 Having undertaken to utilize the judicial process to interpret the settlement and to enforce it, the parties are no longer entitled to invoke the confidentiality ordinarily accorded settlement agreements. Once a settlement is filed in the district court, it becomes a judicial record, and subject to the access accorded such records.
 
 
 33
 Such public access serves several of the important interests we identified in our earlier cases. First, it promotes "informed discussion of governmental affairs by providing the public with [a] more complete understanding of the judicial system" and the "public perception of fairness which can be achieved only by permitting full public view of the proceedings." See Smith II, 787 F.2d at 114 (citing Criden II, 675 F.2d at 557). Disclosure of settlement documents serves as a check on the integrity of the judicial process. See Smith II, 787 F.2d at 114; Wilson v. American Motors Corp., 759 F.2d 1568, 1571 (11th Cir.1985). Although FAB III does not allege that the district court engaged in any impropriety, as a general proposition access assures "that the courts are fairly run and judges are honest". Crystal Grower's Corp. v. Dobbins, 616 F.2d 458, 461 (10th Cir.1980). The applicability and importance of these interests are not lessened because they are asserted by a private party to advance its own interests in pursuing its lawsuits against the Bank and HRA.
 
 
 34
 In reaching its conclusion that access should be denied, the district court relied on the decision in In re Franklin National Bank Securities Litigation, 92 F.R.D. 468 (E.D.N.Y.1981), aff'd sub nom. FDIC v. Ernst & Ernst, 677 F.2d 230 (2d Cir.1982), where the court refused to set aside a protective order that preserved the confidentiality of a settlement of complex multidistrict litigation arising out of the insolvency of one of the nation's largest banks. Two years after the settlement, a public interest group and its lawyer sought to modify the confidentiality order, which the district court declined to do. It appears that in their unsuccessful appeal, the appellants relied on the Freedom of Information Act rather than on the common law right of access to judicial records.
 
 
 35
 In any event, both the district and circuit court opinion stressed the magnitude of the litigation that had been settled and the public interest involved. The FDIC had sued a multitude of parties, including Ernst & Ernst, one of the bank's accountants, to recover the funds the FDIC had paid to the bank's depositors. "The litigation was protracted. During the five years after Franklin National Bank's failure, millions of documents were collected; more than a hundred thousand pages of depositions were taken, and millions of dollars in legal fees were incurred." FDIC v. Ernst & Ernst, 677 F.2d 230, 231 (2d Cir.1982). On the first day of what the district court believed would be "a bitterly contested trial lasting at least six months," In re Franklin National Bank Litigation, 92 F.R.D. at 469, Ernst & Ernst agreed to settle with the FDIC, provided the settlement would be kept confidential. The district court noted the litigation had already engendered 11 reported opinions. "Former directors and officers, classes of shareholders, governmental agencies and accountants were the adversaries. Had the trial continued, many millions of dollars more would have been expended in legal fees, a trial part would have been heavily engaged for a long period, more appeals were inevitable and jurors would have been inconvenienced." Id. at 470.
 
 
 36
 We need not decide whether we would regard a comparable showing as sufficing to override the strong presumption of access. We leave that issue open because no such showing has been made here. The settlement agreement between HRA and the Bank pertained to a single dispute between a small group of parties, unlike the multitude of parties involved in Ernst & Ernst. Moreover, the district court did not rely on any particularized showing of the need for continued secrecy, as asserted in Ernst & Ernst, but instead only on the general interest in encouraging settlement. As we have held, that is not enough. Even if we were to assume that some settlements would not be effectuated if their confidentiality was not assured, the generalized interest in encouraging settlements does not rise to the level of interests that we have recognized may outweigh the public's common law right of access. See Criden I, 648 F.2d at 829 (evidence which may inflict "unnecessary and intensified pain on third parties who the court reasonably finds are entitled to such protection" may be protected); Smith I, 776 F.2d at 1113 (access denied to sealed bill of particulars because of "risk of serious injury to innocent third parties").[4]
 
 IV.
 Conclusion
 
 37
 We conclude that the district court abused its discretion in denying FAB III's motion to unseal the motions and settlement agreement papers. We will reverse the order of the district court and remand so that the court may enter an order in accordance with this opinion. We will also dismiss the appeal in No. 85-1754. See note 2, supra.
 
 GARTH, Circuit Judge, dissenting:
 
 38
 In this case, the Bank and HRA, the developer, settled a financing dispute after a court action had been commenced. At the request of both parties, their settlement agreement was sealed by the court in February 1985.
 
 
 39
 In July 1985, some five months later, FAB III, a contractor who had furnished services to HRA, without having intervened in the Bank-HRA litigation, applied to the district court to unseal the Bank-HRA agreement. The district court denied FAB's motion and refused to unseal the agreement holding that FAB's claimed interest in access to the sealed information did not outweigh the public and private interests in favor of settling disputes.
 
 
 40
 The majority today, totally disregarding the difference between the sealing and the unsealing of an agreement, in an unprecedented decision, holds that the interest in settlement may not outweigh the public's right of access even in private litigation. I cannot agree, and therefore, I dissent.
 
 I.
 
 41
 I believe that the majority misconstrues the issue now before the court. The majority opinion claims the issue before us to be: " ... under what circumstances [may] documents filed in the district court ... be sealed from public access." Maj.Op., at 340. See also Maj.Op., at 345. However, that is not the issue this case presents. The question before us is not whether material which is already public should now be sealed; the question on this appeal is whether a privately negotiated settlement agreement, agreed to and entered into a court record only on condition that it remain secret, should now be unsealed because of the district court's supposed abuse of discretion in permitting it to be filed under seal.[1]
 
 
 42
 The resolution of the correct issue raised here dictates a different approach than the majority has taken: an approach that would protect the reliance interests of the parties absent exceptional circumstances. I therefore disagree with the majority's decision to order the Bank-HRA settlement agreement terms unsealed.
 
 
 43
 Moreover, in reviewing the district court's denial of FAB's motion to unseal the Bank-HRA agreement, the majority adopts, for all practical purposes, a per se rule that the interest in settling cases can never outweigh the public's right of access and thereby justify a court in sealing the terms of a voluntary settlement. The majority opinion holds " ... the generalized interest in encouraging settlements does not rise to the level of interests that we have recognized may outweigh the public's common law right of access. See Criden I, 648 F.2d at 829 ... [and] Smith I, 776 F.2d at 1113 ..." Maj.Op., at 346. The majority's holding on this point is not compelled by any precedent (certainly not by Criden I or Smith I, which are the only authorities cited for that extraordinary proposition), and it utterly ignores the importance of, and the practical realities surrounding, the process of settling lawsuits.
 
 
 44
 Because I believe that the public and private interest in encouraging settlement is entitled to significant weight, and because the majority's analysis and holding cannot help but impair seriously the efficacy of judicial efforts to encourage settlement of many cases, I cannot join in this result. For this reason, too, I respectfully dissent.
 
 II.
 
 45
 As the majority recognizes, in deciding whether the common law right of access compels disclosure of materials before the court, the district court must "weigh[ ] the interests advanced by the parties in light of the public interest and the duty of the courts." Nixon v. Warner Communications, 435 U.S. 589, 602, 98 S.Ct. 1306, 1314, 55 L.Ed.2d 570 (1978). This court has held that the common law right of access creates a presumption of access to all judicial records and documents. United States v. Smith, 776 F.2d 1104, 1110 (3d Cir.1985); United States v. Martin, 746 F.2d 964, 968 (3d Cir.1984). I therefore agree that, as a general matter, the common law right of access applies to settlement agreements when such agreements are filed with the court and become a part of the public record.
 
 
 46
 However, a settlement agreement that has never been disclosed to the public, but which was only entered into the record by the parties with the understanding that it would remain secret, presents a situation different from any situation that this court has addressed before. Although a presumption of access certainly arises when a court seals the transcript of a sidebar conference that has already taken place on the record in open court, United States v. Smith, 787 F.2d 111, 112 (3d Cir.1986), or when a party seeks access to material already entered into evidence and provided to the jury, United States v. Criden, 648 F.2d 814, 815 (3d Cir.1981), this case involves material and information that was never public, giving rise to a new and different factor: the reliance of the parties on the initial and continuing secrecy of the settlement agreement.
 
 
 47
 Although this court has not apparently addressed this precise situation, the Second Circuit has held that, "[o]nce a confidentiality order has been entered and relied upon, it can only be modified if an 'extraordinary circumstance' or 'compelling need' warrants the requested modification." FDIC v. Ernst & Ernst, 677 F.2d 230, 232 (2d Cir.1982). The Second Circuit therefore affirmed the denial of a motion to lift a protective order sealing a settlement agreement.[2] The Second Circuit recently reaffirmed its holding on this point. Palmieri v. State of New York, 779 F.2d 861, 864-65 (2d Cir.1985).
 
 
 48
 The Ernst & Ernst case, while not controlling in this court, presents what I regard as a sensible standard and a sensible result. Although the common law right of access must be given due regard, a court cannot operate in a vacuum. To apply mechanistically the same test no matter what the factual circumstances, is to risk doing injustice to parties before the court.
 
 
 49
 Therefore, I agree that when a document or item of evidence has been entered into the public record without any reliance on secrecy, the interests of the parties seeking to seal or unseal such material must be weighed in light of a presumption of openness. However, when a document has only been entered into the record in reliance on an order keeping it under seal, and when time has passed and the parties have acted in reliance on the terms of that settlement remaining under seal, I would hold with the Second Circuit that the presumption must shift. While the public interest in openness of court records must nevertheless be factored into the balance, I think it is appropriate that a protective order or seal order which itself induced the production or entry of the contested material be presumed to remain in effect, absent a showing of an "extraordinary circumstance" or "compelling need" by a third party seeking to unseal that information.
 
 
 50
 Indeed, in denying FAB III's motion to unseal the settlement in this case, the district court cited Ernst & Ernst. See App. at 90. The majority opinion here also cites to Ernst & Ernst, but nowhere in its opinion does it address the Ernst & Ernst standard for unsealing.[3]
 
 
 51
 I would urge the adoption of the Ernst & Ernst standard and hold that where, as here, a settlement agreement has been filed with the court in reliance upon its being sealed, a third party who comes along after the fact bears the burden of establishing a "compelling need" or other "extraordinary circumstance" justifying access to the sealed agreement. I would further hold that because no such need or circumstance has been demonstrated, the burden has not been carried in this case, and the order of the district court should therefore be affirmed.
 
 III.
 
 52
 Even if I were to accept (which I do not) the majority's holding that the presumption in favor of access to judicial records still applies when a third party seeks to unseal a settlement agreement entered under seal and in reliance upon secrecy, I still could not agree to the majority's rule of law that the interest in settling cases cannot serve to rebut the presumption of access and therefore cannot justify the sealing of a settlement agreement. See Maj.Op., at 345-347. I believe that such a rule is completely out of touch with the reality of running a trial court docket--a reality with which our district court judges must wrestle every day--and if permitted to remain as the law of our circuit will wreak havoc with judicial efforts to encourage settlement of appropriate cases.
 
 
 53
 Although I believe the matter to be self-evident, the majority's out-of-hand rejection of the encouragement of settlement as a relevant factor in the decision to seal a settlement agreement requires me to explain both why I believe that fostering voluntary settlements of civil disputes is desirable and necessary, and why this goal will be unavoidably subverted by the majority's holding in this case.
 
 A.
 
 54
 It is impossible to gainsay that we have experienced a litigation explosion in the United States during the last twenty years, and that developing techniques for managing the increased caseloads and for otherwise stemming the burgeoning tide of litigation costs has become a subject of intense interest and debate. See generally, Symposium, Reducing the Costs of Civil Litigation, 37 Rutgers L.Rev. 217 (1985). Between 1973 and 1983, new filings of civil cases in the federal district courts rose from 98,560 to 241,842, an increase of 145 percent. Levin & Colliers, Containing the Cost of Litigation, 37 Rutgers L.Rev. 219, 27 n. 24 (1985). Perhaps more importantly, the number of long, complex, and difficult-to-try cases has also increased dramatically. The federal courts held 213 trials lasting 20 days or more in 1973. The figure doubled to 426 by 1983. Id. at 229.
 
 
 55
 To cope with the increasing volume of litigation, many commentators have advocated an active, "managerial" role for judges in supervising the course of litigation--a role that includes the encouragement of a variety of alternate means of resolving disputes short of full-dress trials. See Wall, Schiller & Ebert, Should Judges Grease the Slow Wheels of Justice? A Survey on the Effectiveness of Judicial Mediary Techniques, 8 Am.J. Trial Advoc. 83 (1984); Burger, Isn't There a Better Way?, 68 A.B.A.J. 274 (1982).
 
 
 56
 Although arbitration, mediation, mini-trials, and other forms of alternative dispute resolution have gained prominence in recent years as potent weapons in the war against litigation glut, the key component of every rational approach to reducing the burden on our clogged court dockets has been and remains settlement. With very rare exceptions, see Fiss, Against Settlement, 93 Yale L.J. 1073 (1984), commentators and judges who may concur on little else, agree on the value and necessity of a vigorous policy of encouraging fair and reasonable settlement of civil claims whenever possible. Indeed, the literature on the settlement of civil suits focuses not on whether settlement is desirable, but on how best to achieve it and how far a judge should go to encourage it. See, e.g., Provine, Settlement Strategies for Federal Judges (1986) (Federal Judicial Center Study); Craig & Christianson, The Settlement Process, 59 F.R.D. 203, 252 (1973); Fox, Settlement: Helping the Lawyers to Fulfill Their Responsibility, 53 F.R.D. 129 (1971).
 
 
 57
 This court, too, has recognized the overwhelming importance of settling civil suits and avoiding the wasted resources and institutional burden of trying every case:
 
 
 58
 Voluntary settlement of civil controversies is in high judicial favor. Judges and lawyers alike strive assidously to promote amicable adjustments of matters in dispute, as for the most wholesome of reasons they certainly should. When the effort is successful, the parties avoid the expense and delay incidental to litigation of the issues; the court is spared the burdens of a trial and the preparation and proceedings that must forerun it.
 
 
 59
 Pennwalt Corp. v. Plough, Inc., 676 F.2d 77, 80 (3d Cir.1982).
 
 
 60
 Indeed, recognition of the desirability of settlement has even found its way into the Federal Rules of Civil Procedure. Rule 16 was amended in 1983 to include the pursuit of settlement as an express goal of the pretrial conference. See Fed.R.Civ.P. 16(a)(5); 6 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1521 (West Supp. 1986). Thus, an activist role for judges in managing cases--and encouraging their settlement--has expressly been provided for under the federal rules.
 
 
 61
 As any trial judge knows, the settlement of civil cases is not just a permissible and desirable goal, but a practical necessity. In one study of cases filed in ten courts, fully 88 percent were settled; only nine percent went to trial. Galanter, Reading the Landscape of Disputes: What We Know and Don't Know (and Think We Know) About Our Allegedly Contentious and Litigious Society, 31 U.C.L.A.L.Rev. 4, 28 (1983).
 
 B.
 
 62
 While the importance of settlement would seem to be self-evident, I believe it is equally obvious that confidentiality is often a key ingredient in a settlement agreement--and that many settlements would not be reached if the secrecy of their terms could not be safeguarded.
 
 
 63
 Both courts and commentators have recognized the crucial role of confidentiality in facilitating settlement of civil cases. See Provine, Settlement Strategies, supra, at 34; Marcus, Myth and Reality in Protective Order Litigation, 69 Cornell L.Rev. 1, 28, 49 (1983). In addition, the need to keep secret the terms of a settlement has been recognized as a justification for imposing a protective order guaranteeing confidentiality of certain discovery material exchanged prior to settlement. Id. at 49, 52.
 
 
 64
 Indeed, the protective order affirmed by the Second Circuit in the Ernst & Ernst case (and discussed at length in the majority opinion at page 346) was expressly predicated upon the necessity of guaranteeing confidentiality as a condition of settlement. As the district court judge explained:
 
 
 65
 This was a complex, multi-district case involving numerous defendants and numerous plaintiffs. If an agreement could not be concluded, the trial would have lasted at least six months, necessitating enormous expenditures of both litigant and judicial resources. In addition to extensive costs already borne by the [parties] prior to the trial, litigation expenses likely would have consumed the balance of insurance protecting the individual defendants and providing some security for collection of the ultimate judgment.
 
 
 66
 All parties were cognizant of the fact that a critical factor in averting these untoward results was the element of confidentiality.... Without secrecy of the terms, a settlement would not have been consummated.
 
 
 67
 * * *
 
 
 68
 * * *
 
 
 69
 [T]he strong public policy favoring settlement of disputes, particularly in complicated cases, and the importance of the stability of judgments and settlements, argue strongly against modification of the order.
 
 
 70
 In re Franklin National Bank Securities Litigation, 92 F.R.D. 468, 472 (E.D.N.Y.1981), aff'd sub nom. FDIC v. Ernst & Ernst, 677 F.2d 230 (2d Cir.1982) (emphasis added).
 
 
 71
 While few cases address the question of the sealing of settlement agreements, I suspect that this is because many trial judges regard it as self-evident that secrecy is often necessary and they therefore order settlement agreements filed under seal as a matter of course. This conclusion is supported by the frequent references to such sealings made without comment or challenge in reported cases. See, e.g., Marine Midland Bank, N.A. v. Kilbane, 739 F.2d 958, 959 (4th Cir.1984); Owen v. United States, 713 F.2d 1461, 1462 (9th Cir.1983); E.E.O.C. v. Strasburger, Price, Kelton, Martin and Unis, 626 F.2d 1272, 1274 (5th Cir.1980).
 
 
 72
 Parties may have many reasons for desiring secrecy for the terms of their settlements.[4] Settlement agreements may include trade secrets or information that threaten the privacy of the parties. See Nixon v. Warner Communications, Inc., 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978). While this kind of information would itself justify a seal order, parties may in good faith be concerned about releasing a far wider range of information, including information which would not itself entitle the parties to a protective order, but which might stand in the way of settlement if required to be disclosed.
 
 
 73
 The necessity for confidentiality may be particularly acute in the mass tort area, where a defendant must look beyond the parameters of a settlement with a single plaintiff and anticipate the impact of its settlement on innumerable future cases. As Edward A. Dauer, Associate Dean of Yale Law School, explained in a Second Circuit Judicial Conference discussion on alternative dispute resolution:
 
 
 74
 There are legitimate, good faith reasons for the parties who are trying to work out a solution to something like this toxic tort case to want their discussions to be private, immune both from later admission and immune from discovery by other potential plaintiffs' lawyers later down the road, maybe even from competitors, and I think there are good faith reasons for wanting that privacy. That confidentiality is a very large advantage that will, if it can be guaranteed, make these kind of [alternative] procedures even more useful as adjuncts to the judicial process than they already are.
 
 
 75
 101 F.R.D. 161, 233 (1983).
 
 
 76
 For example, if a defendant facing multiple plaintiffs seeks to settle a meritorious claim for a certain sum of money, it may be deterred from doing so if it knows that the terms of such a settlement would have to be made public. The defendant may reasonably assume that disclosure of the comparatively favorable settlement terms would interfere with its ability to settle other cases for smaller amounts. I have no doubt that if all such settlement details were by rule of law always public, many settlements would never take place at all. Many defendants would almost certainly proceed to trial rather than broadcast to all potential plaintiffs how much they might be willing to pay.
 
 
 77
 Moreover, it is precisely in the context of mass torts with multiple plaintiffs--such matters as air disasters, toxic injuries, and product liability claims--that the interest in settlement is particularly strong. Such cases are characteristically long, complex, and costly to try, and the savings in public and private resources achieved by settling them are immense. As one judge familiar with the trial of mass tort cases noted:
 
 
 78
 Even saving one week of judicial time per case would, as most trial judges know, be substantial. For example, in the Dalkon Shield litigation, the record disclosed that, if the usual percentage (90) of the 1000 members statewide class settled their cases, the savings of judicial resources in the trial of the remaining 100 would amount to 400 weeks, or, roughly eight years of trial time. In addition, there would be an estimated savings of $26 million in litigation expense to the parties and $7 million of court expenses.
 
 
 79
 Williams, Mass Tort Class Actions: Going, Going, Gone?, 98 F.R.D. 323, 328 (1983) (Footnotes omitted).
 
 
 80
 The rule announced today by the majority flies in the face of this reality.[5] By holding that settlement agreements may not be sealed to serve the interest of encouraging settlements, I believe the majority has removed from the discretion of our district courts an important technique for encouraging settlement. It is my belief that district court judges in this circuit will read the majority's opinion to the same effect.
 
 
 81
 Under the majority's rule, a district court judge faced with the prospect of a six month, 12 month or longer trial, who is told by the parties that they would settle the case if the terms of settlement could be filed with the court under seal, would have only one choice--to reject the settlement and proceed to trial. The judge would have no discretion to accept the settlement under seal even if the proposed settlement contained little information of public interest and the interests of both sides of the dispute would be furthered by the settlement.
 
 
 82
 With all due respect to my colleagues in the majority, theirs is an illogical and impractical result. We are dealing here not with a constitutional right, but with a flexible common-law rule that has historically been applied subject to the discretion of the district court. Moreover, decisions regarding the management of its docket and the expediting of case resolutions would seem to lie at the core of the district court's discretionary powers. Therefore, assuming that a district court judge correctly weighs the public and private interests involved in deciding whether to order a settlement admitted under seal, I can see no reason why (contrary to the majority rule) the interest in encouraging settlement should not be entitled to due weight.[6] Indeed, any other rule would improperly abridge the traditional discretion of the district judge and seriously impair the ability of judges to expedite settlement.
 
 IV.
 
 83
 Had the majority in this case recognized that the decision to seal and to unseal settlement agreements was to be left to the discretion of the district court employing the Nixon standard and burden of proof for sealing, and the Ernst & Ernst standard and burden of proof for unsealing--standards which the district court here utilized--I would have had far less reason to disagree with the majority result.
 
 
 84
 In this case, the district court acknowledged the correct standards and concluded in its order that "FAB III's asserted interest in access to the sealed information does not outweigh the public and private interests in favor of settling disputes." App. at 90. Although I believe that the district court thereby satisfied its duty to weigh the relevant factors, I could nevertheless understand how others might prefer a more detailed and particularized discussion of how the various asserted interests were, and were not, served on the facts before the court. In such a situation, however, the indicated resolution would have involved no more than a remand to the district court for a fuller statement of its reasons in denying FAB's motion to unseal.
 
 
 85
 Unfortunately, the majority holds instead that the interest in settling cases cannot justify sealing a settlement agreement. Consistent with that holding the majority reverses the district court's order.
 
 
 86
 I believe the adoption of such a rule can only be counter-productive and must necessarily have the effect of discouraging settlement in many cases that would otherwise be routinely ended by the parties' agreement. This, in turn, will undoubtedly force costly and ultimately unnecessary trials.
 
 
 87
 Accordingly, I respectfully dissent from the majority's judgment, and, rather than reverse, I would affirm the district court's order which refused to unseal the Bank-HRA settlement agreement.
 
 
 
 [1]
 The caption shows a third party action, which none of the parties before us have elucidated
 
 
 [2]
 The order and notice of appeal were captioned in both the Bank's suit against HRA and FAB III's suit against the Bank. Appellees have challenged the appealability of that order. In prior cases in this court, orders granting or denying access to sealed portions of the record have been found appealable. See United States v. Smith, 787 F.2d 111, 113 (3d Cir.1986) (Smith II ) ("An order denying access to portions of a trial record is appealable as a final order pursuant to 28 U.S.C. Sec. 1291"); United States v. Criden, 648 F.2d 814 (3d Cir.1981) (Criden I ) (appeal of order denying access to tapes that were introduced in evidence); Publicker Industries, Inc. v. Cohen, 733 F.2d 1059 (3d Cir.1984) (appeal of orders closing a hearing). See also In re Continental Illinois Securities Litigation, 732 F.2d 1302, 1307-08 (7th Cir.1984) (holding such orders to be collateral and appealable pursuant to Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). Because we have jurisdiction to hear the appeal in number 85-1753, the Bank-HRA suit, we need not decide if the order in 85-1754, the pending FAB III action, is appealable. The latter appeal will be dismissed
 The appellees also challenge FAB III's standing to appeal the order in the Bank-HRA case. In United States v. Criden, 675 F.2d 550, 552 n. 2 (3d Cir.1982) (Criden II ), we "assum[ed] that [the party seeking the documents] must move to intervene on each matter that it wishes to preserve for appeal," but we held that the district court's orders denying access to the sealed documents "implicitly grant[ed] [the movant] intervenor status." Apparently, no motion to intervene was made here because FAB III was already a party in one of the two cases in which the motion was filed. It would be a needless formality to require FAB III to return to the district court to file a motion to intervene in the Bank-HRA suit at this late date.
 
 
 [3]
 This court's decisions in Cipollone v. Liggett Group, Inc., 785 F.2d 1108 (3d Cir.1986), and New York v. United States Metals Refining Co., 771 F.2d 796 (3d Cir.1985), which the appellees also rely on, are similarly distinguishable. Both involved challenges to protective orders limiting disclosure of discovery material. Thus, for the reasons that Seattle Times does not govern this case, these decisions also are inapposite
 
 
 [4]
 Because we conclude that the general interest in encouraging settlement is not enough to overcome the presumption of access to judicial records, we need not decide if FAB III's assertion of a particularized need for the settlement documents would further tilt the balance toward disclosure
 
 
 [1]
 Curiously, the majority opinion acknowledges the "unsealing" issue which the parties identified by stating, "We will construe the district court's order as the parties have construed it ... i.e., as a refusal to unseal ... the settlement agreement." Maj.Op., at 342. However, having identified the true issue that was appealed, the majority opinion then fails to either discuss, address or resolve that issue in its opinion
 
 
 [2]
 In the district court opinion affirmed by the Second Circuit, now Chief Judge Weinstein wrote:
 The settlement agreement resulted in the payment of substantial amounts of money and induced substantial changes in position by many parties in reliance on the condition of secrecy. For the court to induce such acts and then to decline to support the parties in their reliance would work an injustice on these litigants and make future settlements predicated upon confidentiality less likely.
 In re Franklin National Bank Securities Litigation, 92 F.R.D. 468, 472 (E.D.N.Y.1981), aff'd sub nom. FDIC v. Ernst & Ernst, 677 F.2d 230 (2d Cir.1982).
 
 
 [3]
 The majority has steadfastly declined to explain why it has refused to acknowledge the evident difference between the act of initial sealing under the Nixon standard--an act which involves no reliance--and the act of subsequent unsealing under the Ernst & Ernst standard, where the factor of the parties' reliance is of primary concern. Instead the majority attempts to blur the significance of this distinction by stressing the timeliness of the unsealing motion brought by a third party and by claiming that "secret judicial proceedings" should not be countenanced as they will lead to the "overturn of centuries of tradition of open access" Maj.Op., at 345. I suggest that these are make-weight arguments
 First, it is not the timeliness of a third party's "unsealing" application that matters. Rather, it is the reliance by the settling parties on the fact that the sealed materials will remain sealed that marks the essential difference between a court sealing a settlement agreement and a court, at some later date, granting an application to unseal that document. Because such settlements cannot readily or practicably be withdrawn. Ernst & Ernst requires that the parties seeking to unseal a relied upon sealed settlement, demonstrate extraordinary circumstances or a compelling need. Timeliness was not the thrust of Ernst & Ernst--reliance was.
 The fact that in this case FAB waited five months--from February to July 1985--before it applied to unseal the Bank-HRA agreement has little bearing on the fact that neither the Bank nor HRA would have entered into the settlement had they not relied upon the district court's act in preventing disclosure of their agreement. Thus, the majority's attempt to distinguish Ernst & Ernst on the ground of "timeliness" is irrelevant.
 Nor is it an answer to the Ernst & Ernst "unsealing" formula to characterize the sealing of documents as "secret judicial proceedings" tending to "overturn centuries of tradition." Id. at 345. The district court employed the Nixon standard when it agreed to seal the Bank-HRA agreement. By balancing the various interests which Nixon requires a court to consider, the district court, in accordance with established Supreme Court precedent, determined that the Bank-HRA agreement should not be disclosed to third parties. I suggest that branding such an action as a "secret judicial proceeding," with all that such a term may connote, and claiming that sealing practices will "overturn centuries of tradition of open access" is not an adequate substitute for reasoned judicial analysis.
 
 
 [4]
 The majority suggests that parties seeking to keep their settlement terms secret should simply stipulate on the record to dismiss the case while negotiating a private settlement. However, this approach is not always practicable, since the parties may, as in the present case, require the further involvement of the court in enforcing the terms of the settlement: a more efficient mechanism than bringing an entirely new suit. Moreover, the court may require terms of settlement to be submitted for its approval as to their fairness and reasonableness. In addition, many settlements, particularly in the mass tort and other contexts may not be implemented without the court's assistance. This is especially so when payments and document exchanges are deferred over extended periods of time
 
 
 [5]
 The majority attempts to skirt this problem by purporting to leave open the issue of what, if any, showing would be necessary to override the strong presumption of access. Maj.Op., at 346. I do not read this attempt, and I seriously doubt whether district court judges will read this attempt, as diluting in any meaningful manner the majority's holding that a district court judge in this circuit henceforth will no longer be permitted to seal settlement agreements
 
 
 [6]
 Assuming that the district court made specific findings indicating that the interest in settlement was strongly served on the facts of this case, that the public interest in openness was not, and that the interests of the third party (in this case FAB III) in obtaining access to the settlement were not substantial, I believe it would be within the discretion of the district court to order that the settlement agreement remain under seal