**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-2954 & 24-2265
_____


In re: ESML HOLDINGS INC, DBA Mesabi Metallics
Company LLC, et al.,
Debtors

MESABI METALLICS COMPANY LLC, FKA Essar Steel
Minnesota LLC

v.

CLEVELAND-CLIFFS, INC., FKA Cliffs Natural
Resources, Inc.;
CLEVELAND-CLIFFS MINNESOTA LAND
DEVELOPMENT LLC;
GLACIER PARK IRON ORE PROPERTIES LLC

CLEVELAND-CLIFFS, INC., FKA Cliffs Natural
Resources, Inc.;
CLEVELAND-CLIFFS MINNESOTA LAND
DEVELOPMENT LLC

v.

CHIPPEWA CAPITAL PARTNERS; THOMAS M. CLARKE

Cleveland-Cliffs, Inc.,
                    Appellant in 23-2954

Cleveland-Cliffs, Inc.; Cleveland-Cliffs Minnesota Land Development LLC,
                    Appellants in 24-2265

_____

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(Bankruptcy Ct. Nos. 16-11626, 17-51210)
Bankruptcy Judge: Honorable Craig T. Goldblatt

_____

Argued on September 24, 2024

Before: KRAUSE, BIBAS, and AMBRO, *Circuit Judges*

(Opinion filed: April 16, 2025)


Robert S. Faxon
Kristin S.M. Morrison
James R. Saywell          **[ARGUED]**
Jones Day
901 Lakeside Avenue East
Cleveland, Ohio 44114

          *Counsel for Appellant*

2

David H. Suggs          **[ARGUED]**
Martin M. Toto
White & Case LLP
1221 Avenue of the Americas
New York, New York 10020

*Counsel for Appellee Mesabi Metallics Co. LLC*

David L. Finger          **[ARGUED]**
Finger & Slanina
One Commerce Center
1201 N. Orange Street, 7th Fl.
Wilmington, Delaware 19801

*Counsel for Appellee Greg A. Heyblom*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

Even before the Founders enshrined a robust right of public access to the courts in the First Amendment, the common law protected the public's right to inspect public records, including documents filed in judicial proceedings. And in the modern era, Congress has codified a statutory right of access for certain categories of public records. But whether the right of access is viewed through the lens of the common law, the First Amendment, or legislation, it reflects a long tradition of open judicial proceedings, enabling litigants and the public to evaluate the work of the

3

courts and imposing a heavy burden on those who seek to seal judicial records.

We consider here whether the public right of access in bankruptcy proceedings is governed by common law or by statute. The Bankruptcy Court believed itself bound by our precedent to conclude that the common law controls and, applying that standard, held that Appellant Cleveland-Cliffs, Inc. (Cliffs) had not carried its burden to keep various judicial records under seal. But astutely recognizing that this precedent could be interpreted otherwise, it certified the question for direct appeal to this Court. We now clarify that the sealing of documents in bankruptcy cases is governed not by the common law right of access, but by § 107 of the Bankruptcy Code, which imposes a heavy, but distinct, burden for a party to keep docketed records from the public eye. Whether Cliffs has satisfied that burden, however, is properly left to the Bankruptcy Court in the first instance, so as to that issue, we will vacate and remand.

## I.    **Background**

### A.    Mesabi's Adversary Proceeding

ESML Holdings, Inc. and its debtor affiliate (collectively, Mesabi) petitioned for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware in 2016 and emerged successfully the following year. During the course of those bankruptcy proceedings,

4

Mesabi initiated an adversary proceeding against Cliffs,[1] alleging tortious interference with contract, federal and state antitrust violations, violation of the Bankruptcy Code's automatic stay provision, and civil conspiracy. Those claims stemmed from Cliffs' alleged anticompetitive conduct that Mesabi asserts was "designed to interfere with and impede Mesabi's contracts and business relationships and prevent . . . Mesabi from completing" an iron ore pellet production facility in northern Minnesota. 2 M. App. 95.[2] And that still-pending adversary proceeding underlies the present appeal.

Importantly for this case, to facilitate the extensive discovery in the adversary proceeding, the parties entered, and the Bankruptcy Court approved, a stipulated protective order (the Protective Order). That order permitted the party producing a document to designate it as confidential if that

---

[1] For the uninitiated, "[a]dversary proceedings are separate lawsuits within the context of a particular bankruptcy case and have all of the attributes of a district court lawsuit . . . with certain modifications." 10 *Collier on Bankruptcy* ¶ 7001.01 (16th ed. 2024). Within the context of an adversary proceeding, a party may, among other things, "recover money or property," subject to certain exceptions; "determine the validity, priority, or extent of a lien or other interest in property"; "object to or revoke a discharge"; "obtain an injunction or other equitable relief"; and "determine a claim or cause of action removed under 28 U.S.C. § 1452," which permits the removal of claims related to bankruptcy cases. Fed. R. Bankr. P. 7001.

[2] To differentiate between the appendices in these consolidated appeals, we use "M. App." for No. 23-2954 and "H. App." for No. 24-2265.

party "believe[d] in good faith" that it "constitute[d] or contain[d] trade secrets, confidential or proprietary information, information that is believed to unreasonably invade the privacy of any individual, information that could cause injury to a person or entity's business or reputation, or such other sensitive commercial or financial information that is not publicly available." *Id.* at 182–83. If a counterparty disagreed with a particular designation, it could lodge a challenge, and the producing party would "have the burden to show that its designation was proper pursuant to Fed. R. Civ. P. 26 or other applicable rule or law." *Id.* at 200.

At the close of discovery, Mesabi moved for a preliminary injunction to prevent Cliffs from acquiring several mineral leases in Minnesota that the state had previously awarded to Mesabi but then terminated and awarded to Cliffs. In support of that motion, Mesabi attached certain documents (the Documents) it obtained from Cliffs during discovery, and because those Documents had been designated as confidential under the Protective Order, it filed them under seal. After a hearing, the Bankruptcy Court declined to preliminarily enjoin the award of the contracts to Cliffs and denied Mesabi's motion.

Undeterred, Mesabi then petitioned for a writ of mandamus from the Minnesota Court of Appeals to reverse Minnesota's award of the disputed mineral leases to Cliffs. As it had before the Bankruptcy Court, Mesabi sought to use the Documents to support its petition, so it moved the Bankruptcy Court to unseal them (the Mesabi Case). Invoking the common law right of access to court filings—which carries a presumption of openness for judicial records—Mesabi argued to the Bankruptcy Court that the public is entitled to that

6

information in light of Cliffs' alleged anti-competitive conduct. Cliffs opposed Mesabi's motion, arguing that it defied the Protective Order, that Mesabi was judicially estopped from moving to unseal the Documents, and that § 107 of the Bankruptcy Code, not the common law, governs the sealing of judicial records in bankruptcy cases.

Relying on our decision in *In re Avandia Marketing, Sales Practices & Products Liability Litigation*, which held that, in order to seal papers filed on a court docket, the party seeking closure "must show 'that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury,'" 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994)), the Bankruptcy Court sided with Mesabi and held that the Documents should be disclosed because Cliffs had not overcome the common law presumption of openness. It interpreted *Avandia* to apply because in that case, much like this one, a party to a protective order moved to unseal judicial records filed under seal, and our Court concluded that the common law right of access attached to the party's request despite its stipulation to the protective order. *In re Essar Steel Minn. LLC*, No. 17-51210, 2023 WL 6202448, at *5–6 (Bankr. D. Del. Sept. 22, 2023). While the Bankruptcy Court was "not without some sympathy for Cliffs' arguments as a matter of first principles," it concluded that "it would be unduly presumptuous for it—a lower court bound by Third Circuit precedent—to distinguish that precedent away based on facts that were equally applicable in *Avandia*." *Id.* at *5.

Recognizing the uncertainty of the law on this point, the Bankruptcy Court stayed its decision for thirty days and certified that decision pursuant to 28 U.S.C. § 158(d)(2)(A),

7

authorizing Cliffs to petition this Court for permission to directly appeal the Bankruptcy Court's order. We granted Cliffs' petition and extended the stay pending disposition of this appeal.

### B. Heyblom's Motion to Intervene

Four months after we granted Cliffs' petition for direct appeal, Appellee Greg Heyblom moved to intervene in the adversary proceeding in the Bankruptcy Court and to unseal the Documents (the Heyblom Case). Heyblom identified himself as "a resident of Nashwauk, MN," which he asserted is "near enough" to where Mesabi "plan[ed] to build a plant . . . to have a beneficial impact on areas such as employment and taxes," giving him "a specific interest in th[e] litigation." 2 H. App. 186–87.

Advancing arguments that echoed Mesabi's, Heyblom maintained that Bankruptcy Code § 107 merely codified the common law standard for sealing judicial records and that Cliffs had not carried its burden to overcome the common law right of access. Cliffs opposed Heyblom's intervention, arguing the Bankruptcy Court lacked jurisdiction while the appeal in the Mesabi Case remained pending before us, that Heyblom lacked standing, and that Heyblom's motion was procedurally defective.

The Bankruptcy Court again rejected Cliffs' arguments and granted both Heyblom's motion to intervene and his motion to unseal the Documents. As for the threshold question of its jurisdiction to decide these motions, the Bankruptcy Court explained that it viewed the subject matter of the appeal in the Mesabi Case as distinct from the subject matter of

8

Heyblom's request because the question of whether Mesabi—"a party to the case that already has the documents it seeks to unseal, but has them subject to a protective order"—may invoke the common law right of public access does not implicate whether Heyblom, "a genuine third party," could access the Documents. *In re Essar Steel Minn. LLC*, No. 17-51210, 2024 Bankr. LEXIS 856, at *21 (Bankr. D. Del. Apr. 8, 2024). Proceeding with caution, however, the Bankruptcy Court also stayed its decision to unseal the Documents in Heyblom's case and again certified its order for direct appeal. Before us, these appeals have been consolidated for disposition.

## II.     Jurisdiction and Standard of Review

The Bankruptcy Court had jurisdiction under 28 U.S.C. § 1334 and § 157(c)(1), and we have jurisdiction under 28 U.S.C § 158(d)(2). We review the application of judicial estoppel, the grant of a motion to unseal, and the grant of a motion to intervene for abuse of discretion. *See Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 100 (3d Cir. 1999); *LEAP Sys., Inc. v. MoneyTrax, Inc.*, 638 F.3d 216, 220 (3d Cir. 2011); *United States v. Territory of Virgin Islands*, 748 F.3d 514, 519 (3d Cir. 2014).

In contrast, we review a bankruptcy court's subject matter jurisdiction *de novo*. *See In re Essar Steel Minn., LLC*, 47 F.4th 193, 196 (3d Cir. 2022). And "[w]hether an incorrect legal standard has been used is an issue of law to be reviewed *de novo*," as well. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (quoting *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006)).

### III.   **Discussion**

We proceed in four parts, as the Bankruptcy Court recognized that this case calls for resolution of several questions that we have not previously addressed. First, as a preliminary matter, we address Mesabi's contention that this case is moot. Moving on to the merits, we then consider Cliffs' contention that Mesabi is judicially estopped from seeking to unseal the Documents; whether Bankruptcy Code § 107 displaces the common law standard governing sealing of judicial records in bankruptcy proceedings; and, finally, whether the Bankruptcy Court had jurisdiction to decide Heyblom's motions while this appeal was pending.

### A.   Mootness

As always, we must assure ourselves of jurisdiction at the outset. *See George v. Rushmore Serv. Ctr., LLC*, 114 F.4th 226, 234 (3d Cir. 2024). Federal courts may only decide live cases or controversies. *See Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020). So when an intervening development makes it "impossible for us to grant any effectual relief whatever to the prevailing party," we have no choice but to dismiss the case for lack of jurisdiction. *Clark v. Governor of N.J.*, 53 F.4th 769, 775 (3d Cir. 2022) (quotation omitted).

After the parties completed briefing in this matter, Mesabi filed a suggestion of mootness, arguing that because "the bankruptcy court ruled on Cliffs' motion for summary judgment," prompting the withdrawal of the reference by the District Court for a jury trial on Mesabi's antitrust claims, the dispute over what standard governs the sealing of documents is moot. Mesabi Suppl. Br. 1. It maintains that "[b]y its own

10

terms, section 107(b) concerns only when 'the bankruptcy court' unseals judicial records" and thus "has no bearing on when the district court unseals judicial records." *Id.* at 3.

Here, we agree with Cliffs that the Bankruptcy Court's summary judgment decision has not rendered this case moot. The United States District Court for the District of Delaware has since withdrawn the reference from the Bankruptcy Court. But the question before us is whether the Documents were properly sealed on the Bankruptcy Court's docket, and transfer of this adversary proceeding to a district court does not automatically unseal documents on a bankruptcy court docket. Rather, "[e]very court has supervisory power over its own records and files," *Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)), so the Documents will remain sealed on the Bankruptcy Court's docket unless and until unsealed by the Bankruptcy Court. And when those Documents have not become available to the public, a live controversy exists for which we can order effective relief. *See Constand v. Cosby*, 833 F.3d 405, 410 (3d Cir. 2016). In short, this appeal is not moot, and we may proceed to Cliffs' arguments for sealing.[3]

---

[3] Cliffs also raises the possibility "that § 107 continues to govern in this bankruptcy case even after the reference has been withdrawn." Cliffs Suppl. Br. 9. Because we conclude this case is not moot for alternative reasons, we need not consider this argument and leave for another day both whether § 107 applies to district courts when they exercise bankruptcy jurisdiction, and whether a bankruptcy court's prior sealing decision continues to control under the law of the case doctrine. *See Saint-Jean v. Palisades Interstate Park Comm'n*, 49 F.4th

B.    Judicial Estoppel

On the merits, Cliffs first asserts that Mesabi's motion to unseal the Documents should have been denied under the doctrine of judicial estoppel. Because Mesabi agreed to be bound by the terms of the Protective Order, Cliffs argues, it should not be permitted to circumvent those terms by filing confidential documents on the Bankruptcy Court's docket, thereby converting them into judicial records and subjecting them to a heightened standard for sealing. We disagree and conclude that the terms of the Protective Order and Mesabi's conduct do not warrant application of judicial estoppel.

The doctrine of judicial estoppel "is one arrow in the quiver of sanctions at a court's disposal . . . to protect the integrity of the court's processes." *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3d Cir. 1999). Unlike other types of estoppel, "judicial estoppel is concerned with the relationship between litigants and the legal system, and not with the way that adversaries treat each other." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 781 (3d Cir. 2001). Its purpose is intuitive—"to prevent parties from playing fast and loose with the courts by asserting inconsistent positions" in different judicial proceedings. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996).

To warrant judicial estoppel, three elements must exist: "(1) the party to be estopped is asserting a position that is

830, 836 (3d Cir. 2022) ("Law of the case may counsel against, but does not prevent, a . . . court from reconsidering its prior rulings.").

12

irreconcilably inconsistent with one [it] asserted in a prior proceeding; (2) the party changed [its] position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity." *Montrose Med. Grp.*, 243 F.3d at 777–78. Additionally, judicial estoppel does not apply when a party's initial position was not "accepted or adopted by a court or agency." *Id.* at 782.

While judicial estoppel emerges from a party's taking different positions, the doctrine is "not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003). Rather, a litigant's change in position must demonstrate a degree of culpability amounting to an "assault[] [on] the dignity or authority of the court," *Montrose Med. Grp.*, 243 F.3d at 781, and because "judicial estoppel is often the harshest remedy," *Klein*, 185 F.3d at 110, it "should only be applied to avoid a miscarriage of justice," *Krystal Cadillac-Oldsmobile*, 337 F.3d at 319.

Here, Mesabi's alleged change in position does not cross that threshold. It is simply not the case that, by stipulating to the Protective Order, Mesabi took the position that the Documents would remain sealed indefinitely. To the contrary, while the Protective Order allows a party to "designate the documents or information" confidential if it "believes in good faith" that the document falls within the specific categories, meaning that the document will be initially sealed if filed on the docket, 2 M. App. 182–83, the counterparty can dispute that designation by "mov[ing] the

13

[Bankruptcy] Court for an order seeking [such] relief," and the Bankruptcy Court will then resolve the dispute, *id.* at 193.

Thus, the Protective Order does not provide that any particular documents warrant sealing or that the parties agree that certain categories of documents or information will remain shielded from the public. Instead, it establishes a system whereby the party producing the document may, at the discovery stage, designate a document as confidential, triggering the protection of the Protective Order. But a party can rebut that protection by showing that redaction or sealing is not warranted. In essence, then, the Protective Order is prophylactic: The Bankruptcy Court permitted the parties to maintain under seal documents containing information designated by the producing party as confidential, subject to later challenges to the propriety of those designations. It did not license sealing of all designated documents in perpetuity. So Mesabi's later motion to unseal the Documents does not amount to a position that is "irreconcilably inconsistent" with the Protective Order. *Montrose Med. Grp.*, 243 F.3d at 777.

We also reject Cliffs' argument that Mesabi's stipulation to the Protective Order is a position that the Bankruptcy Court "adopted" for purposes of judicial estoppel. As a general matter, judicial estoppel most readily applies when courts or agencies base factual findings or legal conclusions on the position advanced by the party to be estopped. *See, e.g.*, *Detz v. Greiner Indus., Inc.*, 346 F.3d 109, 119–20 (3d Cir. 2003). But for the reasons described above, when the Bankruptcy Court entered the Protective Order, it did not make any factual or legal conclusions. Instead, it established a mechanism to control the exchange of sensitive information during discovery in this sprawling antitrust

14

adversary proceeding, leaving for later the decision whether to seal challenged documents. For this reason, too, the Bankruptcy Court correctly declined to apply judicial estoppel.[4]

### C. Mesabi's Motion to Unseal

We next turn to Cliffs' primary argument—that § 107 of the Bankruptcy Code displaces the common law standard for sealing documents filed in bankruptcy cases, and that the Bankruptcy Court thus erred by concluding that "*Avandia* provides the applicable standard." *In re Essar Steel Minn.*, 2023 WL 6202448, at *5. Below, we review (1) the common law right of access, and (2) the requirements of § 107, before turning to (3) its application to this case.

---

[4] To the extent Cliffs maintains that "Mesabi took the position that documents marked confidential would be used only in this litigation," Opening Br. 18, all indications suggest that Mesabi has complied with this provision of the Protective Order. Regardless, the Protective Order lets each party use protected documents in other litigation if they obtain "further agreement of the Parties" or a "Court order." 2 M. App. 186. An order unsealing the Documents for public inspection and use might qualify as such a court order. We take no position on whether it does or on whether a breach of the Protective Order would warrant judicial estoppel or any other sanction. For now, we note only that Cliffs points to no evidence that Mesabi has used information or documents obtained through this adversary proceeding for other purposes.

15

### 1.    *The Common Law Right of Access*

The common law right of access "antedates the Constitution," *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 343 (3d Cir. 1986), and "promotes public confidence in the judicial system by enhancing testimonial trustworthiness and the quality of justice dispensed by the court," *Littlejohn*, 851 F.2d at 678. Its historical pedigree runs deep, dating to at least the seventeenth century, when "Sir John Hawles commented that open proceedings were necessary so that truth may be discovered in civil as well as criminal matters." *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 386 n.15 (1979) (emphasis and internal quotation marks omitted). And courts have repeatedly reaffirmed "the principle that the public holds a common law right of access to judicial proceedings and judicial records." *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 659 (3d Cir. 1991).

That tradition continues. Today, the common law right of access protects the "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon*, 435 U.S. at 597 (footnote omitted). The scope of this common law right thus "turns on whether [a particular document] is considered to be a 'judicial record.'" *Avandia*, 924 F.3d at 672 (quoting *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001)). We have held that judicial records include those "document[s] that 'ha[ve] been filed with the court . . . or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings.'" *Id.* (omission in original) (quoting *In re Cendant Corp.*, 260 F.3d at 192). For that reason, "pretrial motions of a nondiscovery nature, whether preliminary or

16

dispositive, and the material filed in connection therewith," *id.* (quoting *In re Cendant Corp.*, 260 F.3d at 192), enjoy a "presumption of [public] access," *id.*, and the party seeking closure bears the burden of demonstrating "that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure," *id.* (quoting *Miller*, 16 F.3d at 551).

To be clear, the common law right of access is distinct from the First Amendment right of access, with which it is often confused. The First Amendment is even more robust. While the common law right of access protects access to documents and filings, *see id.*, the First Amendment's protections extend to judicial proceedings themselves, *see Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984). It protects the public's right of "access to information" about "what occur[s]" in the halls of justice, "not only by witnessing a proceeding firsthand, but also learning about it through a secondary source." *United States v. Antar*, 38 F.3d 1348, 1360 (3d Cir. 1994). And the First Amendment demands access not for access's own sake, but "to ensure that th[e] constitutionally protected discussion of governmental affairs is an informed one."[5] *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 605 (1982) (internal quotation marks omitted).

---

[5] In other words, the First Amendment extends beyond in-person attendance and embodies a commitment to the public's access to sources of information of "what occurred" during the proceedings, ensuring the public's ability to "monitor, observe, and comment upon the activities of the judge and the judicial process." *United States v. Antar*, 38 F.3d 1348, 1360–61 (3d Cir. 1994) (quoting *United States v. Smith*, 787 F.2d 111, 115 (3d Cir. 1986)).

17

Where it attaches,[6] "[t]he First Amendment right of access requires a much higher showing than the common law right before a judicial proceeding can be sealed." *In re Cendant Corp.*, 260 F.3d at 198 n.13. We have characterized this showing as an "overriding interest based on findings that closure is essential to preserve higher values," *Publicker Indus.*, 733 F.2d at 1073 (quoting *Press-Enterprise Co. v. Superior Ct.*, 464 U.S. 501, 510 (1984)), and any such restriction must survive strict scrutiny, *see PG Publ'g Co. v. Aichele*, 705 F.3d 91, 104 (3d Cir. 2013).

Notwithstanding their differences, however, both the common law and First Amendment serve a common goal: They protect the public's right to "acquir[e] information about" judicial proceedings, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980) (plurality opinion), "contribut[ing] to public understanding of the rule of law and to comprehension of the functioning of the entire . . . justice system," *id.* at 573 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 529, 587 (1976) (Brennan, J., concurring)). Together, the common law right of access and the First Amendment enable "'the free discussion of governmental affairs' . . . ensur[ing] that the individual citizen can effectively participate in and contribute to our republican system of self-government."

---

[6] We review challenges to access under the First Amendment using a two-prong, experience-and-logic test: "(1) the experience prong asks 'whether the place and process have historically been open to the press'; and (2) the logic prong evaluates 'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Avandia*, 924 F.3d at 673 (quoting *N. Jersey Media Grp. Inc. v. United States*, 836 F.3d 421, 429 (3d Cir. 2016)).

*Globe Newspaper*, 457 U.S. at 604 (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

## 2. *Bankruptcy Code § 107*

Against the backdrop of this longstanding common law presumption of public access, Congress has passed legislation protecting access to certain categories of documents,[7] including in 11 U.S.C. § 107. The first subsection declares that, with limited exceptions, "paper[s] filed in a case under [the Bankruptcy Code] and the dockets of a bankruptcy court are public records and open to examination by an entity." 11 U.S.C. § 107(a). Thus, § 107, like the common law right of access, triggers a presumption that records filed in judicial proceedings are subject to public review and inspection. The next subsection, however, identifies two circumstances in which the sealing of such papers is appropriate:

> (b) On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may—
>
>> (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or

---

[7] *See, e.g.*, Freedom of Information Act, Pub. L. 89-487 (1966) (codified at 5 U.S.C. § 552); Presidential Records Act, Pub. L. 95-591 (1978) (codified as amended at 44 U.S.C. §§ 2201–2209).

19

(2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

So § 107 certainly resembles the common law in that it "evidences [C]ongress's strong desire to preserve the public's right of access to judicial records in bankruptcy proceedings," *In re Orion Pictures Corp.*, 21 F.3d 24, 26 (2d Cir. 1994). And some courts have described § 107 as "codifying" the common law. *See, e.g., id.*; *In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 746 (D. Del. 2018); *see also* 2 *Collier on Bankruptcy* ¶ 107.02 (16th ed. 2024) ("[S]ection 107(a) codifies the public's general right under common law to inspect and copy public documents, including judicial records."). But whether it merely codifies the common law doctrine or diverges from it is not a question we have yet addressed precedentially. We do so today.

### 3. *Application to This Case*

This case presents the question of whether the common law public right of access and § 107 are coextensive and, if not, whether § 107 displaces the common law in bankruptcy proceedings. It is a longstanding rule that where Congress has enacted a provision to govern a particular question, the common law yields to that statute. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 316–17 (1981). But it is an equally "longstanding [rule] . . . that '[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles.'" *United States v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). For that reason,

"[i]n order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Id.* (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)).

To determine whether § 107 speaks directly to the question addressed by the common law and sufficiently differs from the common law to abrogate it, we look to the statute's text. As recounted above, § 107(a) sets out a general presumption of access for "paper[s] filed in a case under [the Bankruptcy Code] and the dockets of a bankruptcy court," and then goes on to lay out several exceptions to this presumption. As relevant here, § 107(b) provides that, when sought by a party in interest, the bankruptcy court "shall" protect "an entity with respect to a trade secret or confidential research, development, or commercial information" and "a person with respect to scandalous or defamatory matter." 11 U.S.C. § 107(b). So by its terms, § 107 governs the sealing of information and documents filed in bankruptcy cases, and thus "'speak[s] directly' to the question addressed by the common law," *Texas*, 507 U.S. at 534 (quoting *Mobil Oil Corp.*, 436 U.S. at 625), namely, whether and under what circumstances judicial records may be sealed.

The only remaining question is whether § 107 diverges from the common law such that it displaces, rather than merely "codifies," that doctrine. We conclude that it does in two major respects.

First, § 107(b)(1) permits sealing of "a trade secret or confidential research, development, or commercial information." Such information is broader than the information that could be protected under the common law

21

doctrine,[8] which requires the proponent of sealing to show not only a protected category of information—which would include trade secrets or other confidential commercial information—but also that the disclosure of this information "will work a clearly defined and serious injury to the party seeking closure." *Avandia*, 924 F.3d at 672 (quoting *Miller*, 16 F.3d at 551).

Second, § 107(b) uses the mandatory term "shall" to direct the bankruptcy court's protection of the categories of information that follow, meaning the bankruptcy court lacks discretion to decline to protect covered information. *See In re FTX Trading Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024). The common law doctrine, on the other hand, permits courts to exercise their discretion by weighing whether "the [proponent's] interest in secrecy outweighs the presumption [of public access]." *Bank of Am.*, 800 F.2d at 344. The statute thus "eliminates the balancing of public and private interests required by the common law rule," rendering "the strength of the public's interest in a particular judicial record . . .

---

[8] At oral argument, Cliffs asserted that "confidential" in § 107(b)(1) modifies each of "research, development, or commercial information." *See* Oral Arg. Tr. 10:16–21. We agree. We generally read modifiers preceding an enumeration as modifying each noun or verb in the series. *See United States v. Jumper*, 74 F.4th 107, 113 (3d Cir. 2023); Antonin Scalia & Bryan Garner, *Reading Law* 147 (2012). Section 107(b)(1)'s straightforward construction lends itself to application of this series-modifier canon, distributing "confidential" to modify each type of "information." Thus, to qualify for § 107(b)(1)'s protection, a party's "commercial information" must be "confidential."

22

irrelevant." *In re Roman Cath. Archbishop*, 661 F.3d 417, 430–31 (9th Cir. 2011). Put differently, with § 107, Congress has struck its own balance by which the courts must abide.

Given these differences, we hold today that § 107 does not "codify" *Avandia* in the sense that it brings with it all of the common-law soil in which that decision is rooted, but rather differs from and displaces the common law standard for sealing judicial records in bankruptcy cases. With this holding, we join our sister circuits that have reached similar conclusions. *See id.* at 431; *In re Neal*, 461 F.3d 1048, 1053 (8th Cir. 2006); *In re Gitto Glob. Corp.*, 422 F.3d 1, 8 (1st Cir. 2005); *In re Orion Pictures*, 21 F.3d at 27.

But we do not go so far as to accept Cliffs' subsidiary argument—that § 107's protection for confidential commercial information permits sealing of records whose disclosure would work no harm at all. Indeed, we emphatically reject it.

In order to give effect to—and avoid eviscerating—§ 107(b)'s limitation to information qualifying as "trade secrets" or "research, development, or commercial information" that is "confidential," the disclosure of a judicial record must still "cause 'an unfair advantage to competitors,'" *In re Orion Pictures*, 21 F.3d at 27 (quoting *In re Itel Corp.*, 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)). The ordinary meaning of § 107(b)'s terms confirm this requirement. *See In re Roman Cath. Archbishop*, 661 F.3d at 432–33. "Trade secret" is defined as "[a] formula, process, device, or other business information that is kept confidential to maintain an advantage over competitors." *Trade Secret*, *Black's Law Dictionary* (12th ed. 2024). Relatedly, in this context, "confidential" means information "meant to be kept secret." *Confidential*,

23

*Black's Law Dictionary*, *supra*. Thus, by their plain terms, the categories of information protected by § 107(b) entail that their disclosure would cause competitive injury.

To be clear, this qualifier is not as onerous as the common law requirement that disclosure "will work a clearly defined and serious injury to the party seeking closure." *Avandia*, 924 F.3d at 672 (quoting *Miller*, 16 F.3d at 551). But there still must be a substantial risk that disclosure would detrimentally affect the producing party's competitive standing—a showing that differs from the common law doctrine in degree, rather than kind. *See In re Orion Pictures*, 21 F.3d at 27. And such a risk of competitive injury still must be actual and objective, not speculative or subjective. *Cf. In re Roman Cath. Archbishop*, 661 F.3d at 432–33 (holding that the test for sealing "scandalous" material under § 107(b)(2) is objective, requiring "the party seeking non-disclosure" to show the material is "scandalous as that word is commonly understood"). So bankruptcy courts must evaluate requests to seal through this objective lens and may not simply credit a party's assertion of competitive injury. *See In re Orion Pictures*, 21 F.3d at 27.

Cliffs asserted at oral argument that it would succeed under this competitive-injury standard, and that position may prevail at the end of the day. But the Bankruptcy Court did not have the opportunity to consider whether disclosure of the Documents would work even the less onerous competitive injury that § 107 demands to justify sealing. Accordingly, we will remand and permit it to apply the correct standard in the first instance.

D.      Heyblom's Motion to Intervene

Finally, we consider whether the Bankruptcy Court properly exercised jurisdiction to grant Heyblom's motions to intervene and to unseal the Documents while Cliffs' appeal was pending before this Court. We conclude that it did not, so we will vacate those orders.

When a party files a notice of appeal from a final order, that filing "is an event of jurisdictional significance" because "it confers jurisdiction on the court of appeals and divests the [trial] court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). While this "appellate divestiture" rule is not ironclad, exceptions to it are appropriately circumscribed. *See, e.g.*, *Sheet Metal Workers' Int'l Ass'n Loc. 19 v. Herre Bros., Inc.*, 198 F.3d 391, 394 (3d Cir. 1999). So "[d]uring the pendency of the appeal the [trial court] retains only the limited authority to take any steps that will assist the Court of Appeals in its determination." *SEC v. Invs. Sec. Corp.*, 560 F.2d 561, 568 (3d Cir. 1977) (quoting *United States v. Lafko*, 520 F.2d 622, 627 (3d Cir. 1975)).

Here, the Bankruptcy Court exceeded its jurisdiction by granting Heyblom's motions. We accepted Cliffs' petition for direct appeal in the Mesabi Case and thus acquired jurisdiction over it on October 16, 2023. Yet it was not until over four months later, on February 26, 2024, that Heyblom filed his motions. At that point, the Bankruptcy Court's jurisdiction was "limited" to matters that would "assist the Court of Appeals in its determination," *Invs. Sec. Corp.*, 560 F.2d at 568 (quoting *Lafko*, 520 F.2d at 627), of "those aspects of the case

25

involved in the appeal," *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (quoting *Griggs*, 459 U.S. at 58).

The Bankruptcy Court's grant of Heyblom's motions could not "assist" our determination of the issues involved in the Mesabi Case. Quite the opposite. Granting the relief Heyblom requested—unsealing of the very information sought to be disclosed on appeal—would moot the same issues on appeal and strip us of jurisdiction. *See Constand*, 833 F.3d at 410 ("Public disclosure cannot be undone because . . . we simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again." (cleaned up)). As a result, the Bankruptcy Court lacked jurisdiction to consider those motions while Cliffs' appeal remained pending.

True, here, the Bankruptcy Court exercised its sound discretion to stay its order and preserve the sealing issue for our consideration. But we assess the existence of a court's jurisdiction at the outset, not based on what relief it ultimately grants. So even though the order unsealing the Documents was later stayed, it "largely defeat[ed] the point of the appeal" for the Bankruptcy Court to enter that order when that issue "is precisely what the court of appeals must decide." *Bradford-Scott Data Corp. v. Physician Comput. Network, Inc.*, 128 F.3d 504, 505–06 (7th Cir. 1997).

The Bankruptcy Court lacked jurisdiction to consider Heyblom's motions while we considered Cliffs' appeal in the Mesabi Case.[9]  Accordingly, we will vacate those orders.

## IV.    Conclusion

For the foregoing reasons, we will affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

---

[9] We recognize that, in bankruptcy, "[t]he rules are different," *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501 (2015), as they must be, *see* 1 *Collier on Bankruptcy* ¶ 5.08[1][b] (16th ed. 2024) ("[A] bankruptcy case is an aggregation of individual controversies, sometimes designated as contested matters, sometimes as adversary proceedings, the resolution of which must be reached before bankruptcy distribution can be made." (footnotes omitted)).  Accordingly, our decision today is appropriately limited to the unique facts of this case—the issues involved in the Mesabi Case and Heyblom Case so overlapped that, by granting the relief requested by Heyblom, the Bankruptcy Court would have prevented our consideration of Cliffs' appeal in the Mesabi Case absent imposing a discretionary stay.  We do not doubt that bankruptcy courts necessarily retain jurisdiction over many aspects of a bankruptcy case even when discrete disputes may give rise to final, appealable orders.